UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JENNIFER B. CAMPBELL, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 12-1769 (RC) |
| | : | | |
| v. | : | Re Document No.: | 7 |
| | : | | |
| DISTRICT OF COLUMBIA *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## <u>MEMORANDUM OPINION</u>

### GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

### I. INTRODUCTION

The plaintiff in this action claims that her former employer, a District of Columbia administrative agency, wrongfully terminated her for disclosing improprieties in the bidding process for government contracts relating to the implementation of health benefit exchanges. She also alleges that, as her termination unfolded, officers within the agency leaked defamatory statements about her to the media. Five months after her termination, the plaintiff filed this lawsuit against the District of Columbia and one of its officers in his official capacity, asserting claims for constitutional defamation and various violations of D.C. law. The defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted. Because the plaintiff has failed to plead the "protected disclosure" required for a claim under the D.C. False Claims Act, the Court will grant the defendants' motion as to that claim but grant leave for the plaintiff to amend her complaint. Because the claims against the individual officer of the D.C. government are duplicative of the claims against the District, the Court will merge

those claims and dismiss the officer as a party. The Court will deny the remainder of the defendants' motion.

## II. FACTUAL ALLEGATIONS

In her complaint, Jennifer B. Campbell alleges that she is an experienced healthcare consultant, having acted as an associate director of a best-practice think tank and principal of a healthcare consulting corporation, both based in Washington, D.C. *See* Compl. ¶ 15, ECF No. 1. In 2008, she was hired by the D.C. Department of Health Care Finance ("DHCF") as Associate Director of the Office of Utilization Management within DHCF's Health Care Accountability Administration. *See id.* Eventually, Ms. Campbell was promoted to the position of Chief Operating Officer at DHCF—a position in which she served as the top advisor to Wayne Turnage, the Director of DHCF and a defendant in this action. *See id.* ¶ 16.

On March 23, 2010, President Obama signed into law the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified as amended at scattered sections of U.S.C.), setting forth many structural changes to the American healthcare system. A major part of the PPACA involves the establishment of health benefit "exchanges," which serve as online marketplaces for health insurance. *See generally* 42 U.S.C. §§ 18301–33 (Supp. V 2011). Some of the exchanges are to be state-run, and the District of Columbia enacted the Health Benefit Exchange Authority Establishment Act of 2011, No. 19-94, 59 D.C. Reg. 213 (codified as amended at D.C. Code §§ 31-3171.01–.08 (Supp. 2012)), setting up an authority to oversee the implementation of the District's health benefit exchange. *See also* Compl. ¶¶ 8–10, ECF No. 1. The District looked to the private sector for information technology support in creating and managing its exchange (the "DCAS Project"), presenting the opportunity for a valuable government contract, estimated at over $70 million. *See id.* ¶ 11. Ms. Campbell

alleges that Mr. Turnage maintained an "open door policy" with contractors, allowing vendors to meet with him in person. *See id.* ¶ 18. However, she alleges that his door was "open" to only a few preselected vendors—a practice Ms. Campbell urged him to change, and to either allow all contractors visitation, or none. *See id.*

CGI Group, Inc. ("CGI") is a large information technology and consulting company that sought to do business with the District as part of the DCAS Project. *See id.* ¶ 19. Ms. Campbell alleges that CGI had a "pre-established relationship" with Mr. Turnage as a result of his prior work with the company, and that CGI was in negotiations with DHCF for the health information technology project (the "HIT Project"), another contract valued at approximately $11 million. *See id.* ¶¶ 19–20. Upon her review of CGI's draft contract for the HIT Project, Ms. Campbell identified several issues with the contract and called a meeting with DHCF's contract division lead and other members of the COO staff to discuss the project. *See id.* ¶ 23. Her specific concerns about the contract included a missing liquidated damages clause and inconsistencies between the draft contract and CGI's best and final offer. *See id.* After the meeting, the contracts division staff discussed these concerns with CGI, who was resistant to addressing them. *See id.* ¶ 24.

CGI later met with Mr. Turnage, Ms. Campbell, and other DHCF staff members to discuss its bid for the DCAS Project. *See id.* ¶ 26. At this meeting, it was brought to CGI's attention that the District requires that at least 35 percent of any contract over $250,000 go to a qualified small, local, or disadvantaged business, known as a certified business enterprise or "CBE." *See id.* ¶ 27; *see also* D.C. Code § 2-218.46(a)(2) (2001). CGI was not a CBE, and thus reached out to Ms. Campbell to discuss potential CBEs with which it could partner for the DCAS Project. *See* Compl. ¶¶ 29–30, 33, ECF No. 1. Ms. Campbell alleges that she alerted CGI to the

3

fact that the District makes performance reviews of its contractors publicly available, and suggested that CGI review them. *See id.* ¶¶ 33–34.

According to Ms. Campbell's allegations, CGI later met with Mr. Turnage and other DHCF staff without her presence. *See id.* ¶ 35. DHCF later placed Ms. Campbell on administrative leave, and then terminated her for cause in June 2012. *See id.* ¶¶ 41, 48. Ms. Campbell later received a letter from the District of Columbia, claiming that she had "acted inappropriately and violated District ethical standards . . . by giving preferential treatment to any person, impeding government efficiency or economy; and by affecting adversely the confidence of the public in the integrity of the government." *Id.* ¶ 57. The letter went on to state that COMPASS Consulting Services, Inc. ("COMPASS")—a company that was considering a potential partnership with CGI—had accused Ms. Campbell of, among other things, instructing CGI to call off its potential partnership with COMPASS. *See id.* ¶¶ 22, 60–61, 63. The media also caught wind of Ms. Campbell's termination, and both the Washington City Paper and the Washington Post published articles describing her departure for allegedly steering contracts toward a particular CBE. *See id.* ¶¶ 49, 66. Ms. Campbell alleges that information was leaked by DHCF, and that the allegations in the media and the District's letter are untrue. *See id.* ¶¶ 45, 53, 59, 62, 64.

Since her termination, Ms. Campbell has been unable to find employment in the field of healthcare finance.[1] *See id.* ¶ 78. She places the blame on the publicity and false allegations surrounding her termination, and alleges that at least one potential employer has stated that,

---

[1] The Court is only aware of Ms. Campbell's employment status up until the date on which her opposition brief was filed: January 22, 2013. On that date, she represented to the Court that she had been unable to find full-time employment. *See* Pl.'s Mem. Opp'n Mot. Dismiss 8 n.6, ECF No. 9.

while she would have been a "perfect fit" for an open position, hiring her would have been too much of a public and political liability risk. *See id.* ¶ 79.

On October 31, 2012, Ms. Campbell filed a complaint against Mr. Turnage and the District of Columbia, alleging constitutional defamation, various whistleblowing claims, and wrongful termination against public policy. *See id.* ¶¶ 76–99. Defendants have moved to dismiss all four counts pursuant to Federal Rule of Civil Procedure 12(b)(6). *See generally* Defs.' Mot. Dismiss, ECF No. 7.

### III. LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). It is not necessary for the plaintiff to plead all elements of her prima facie case in the complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief

above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

## IV. ANALYSIS

Ms. Campbell's complaint contains four causes of action: constitutional defamation; retaliatory termination in violation of the D.C. False Claims Act ("DCFCA"); violation of the D.C. Whistleblower Protection Act ("DCWPA"); and wrongful termination against public policy. Defendants move to dismiss all four claims for failure to state a claim upon which relief can be granted. They also move to dismiss the claims against Mr. Turnage because they are duplicative of Ms. Campbell's claims against the District of Columbia.

### A. Constitutional Defamation (Count I)

Ms. Campbell's complaint asserts constitutional defamation in violation of the Civil Rights Act of 1871. *See* 42 U.S.C. § 1983 (2006). A constitutional defamation claim brought under section 1983 may be based upon a state actor's deprivation of a plaintiff's Fifth or Fourteenth Amendment[2] due process right to choose her field of private employment. *See Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999); *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972). However, enforcement of this due process right has been guided by the general

---

[2] Where the relevant state actors are agents of the D.C. government, the Fifth Amendment is the source of the constitutional right. *See, e.g.*, *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

6

policy, as articulated by the Supreme Court, that there is "no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause . . . ." *Paul v. Davis*, 424 U.S. 693, 702 (1976). A plaintiff must show more than a mere harm to her reputation. *See Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) (citing *Paul*, 424 U.S. at 697, 711–12). Thus, there are two theories on which a public employee suffering an adverse employment action may proceed. The first, called a "reputation-plus" claim, imposes liability on a public employer who makes a defamatory statement about the plaintiff *in the course of the termination* of her employment. *See O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998); *Rowe v. District of Columbia*, 892 F. Supp. 2d 174, 181 (D.D.C. 2012). The second, called a "stigma or disability" claim, may lie where a plaintiff has suffered stigma or disability flowing from an adverse employment action. *See O'Donnell*, 148 F.3d at 1140–41; *Rowe*, 892 F. Supp. 2d at 181. Under this theory, "a plaintiff who . . . seeks to make out a claim of interference with the right to follow a chosen trade or profession that is based exclusively on reputational harm must show that the harm occurred in conjunction with, or flowed from, some tangible change in status." *O'Donnell*, 148 F.3d at 1141. The parties' briefing focuses primarily on the "stigma or disability" theory. *See, e.g.*, Pl.'s Mem. Opp'n Mot. Dismiss 5–8, ECF No. 9.

Stigma arising from termination of employment infringes upon a constitutionally protected liberty interest if a plaintiff's preclusion from employment "is either sufficiently formal or sufficiently broad." *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995). Thus, a "stigma or disability" gives rise to a constitutional defamation claim if the adverse employment action (1) constitutes a formal bar, automatically excluding a plaintiff from her chosen trade or profession; or (2) has the broad effect of largely precluding a plaintiff from her

7

chosen career. *See O'Donnell*, 148 F.3d at 1141 (citing *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994)).

Because Ms. Campbell does not allege that her termination from DHCF constitutes a formal, automatic disqualification to her further employment in healthcare finance,[3] she must allege that her termination effectively precludes her participation in the field. Defendants argue that the complaint fails to meet this requirement, consisting only of broad, conclusory allegations that do not meet the "plausibility" requirement of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). *See* Pl.'s Mem. Opp'n Mot. Dismiss 7–8, ECF No. 9. But Ms. Campbell has pleaded that her termination (1) "impugned [her] professional competence and reputation and placed a significant roadblock on her ability to obtain permanent full time employment"; (2) "created a stigma that foreclosed [her] freedom to take advantage of other employment opportunities"; and (3) "substantially reduced the value of [her] human capital and her professional responsibilities." Compl. ¶¶ 78, 80–81, ECF No. 1. These allegations are supported by a specific reference to at least one instance in which she was told by a potential employer that, while she was a "perfect fit," her reputation presented too much of a public and political liability risk. *See id.* ¶ 79. It is plausible that these harms would flow from Ms. Campbell's discharge for alleged contract steering and ethical violations. The Court also notes that far less specific allegations have survived the Rule 12(b)(6) stage before other judges in this district following *Twombly*. *See, e.g.*, *Payne v. District of Columbia*, 773 F. Supp. 2d 89, 96 (D.D.C. 2011) (allowing a constitutional defamation claim based on allegations that the adverse action created a "significant roadblock" to the plaintiff's participation in his field and deprived him of his "freedom to take

---

[3] The scope of the "healthcare finance" profession may have an effect on the ultimate success of Ms. Campbell's claim. However, because the parties do not dispute the issue in their briefing, the Court need not address it at this juncture.

advantage of other employment opportunities"); *see also Holman v. Williams*, 436 F. Supp. 2d 68, 80 (D.D.C. 2006) (allowing, pre-*Twombly*, a constitutional defamation claim to go forward in which the plaintiff merely pleaded that a newspaper recount of his termination damaged his professional reputation, and that he had been unable to secure other employment since).

Defendants also argue that Ms. Campbell's stigma allegations are implausible because she brought suit just five months after her termination, and "[f]ive months is by no means a long period of time to find a job . . . ." Defs.' Mem. P. & A. Supp. Mot. Dismiss 8, ECF No. 7. But Defendants cite no authority suggesting that timing is relevant to the plausibility of a stigma or disability, nor do they provide any logical reasoning that would aid the Court (or Ms. Campbell) in determining the exact duration of unemployment that would convert her stigma from implausible to plausible. Moreover, although five months[4] may not seem like a long period of unemployment in the current economic climate, it is plausible that the nationwide implementation of the PPACA would nonetheless put Ms. Campbell's healthcare finance skills in high demand. The Court will therefore deny Defendants' motion to dismiss Count I.[5]

---

[4] Although the matter is outside of the complaint, the Court takes note that while briefing was underway, Ms. Campbell represented that she remained unemployed nearly eight months after her termination. *See supra* note 1.

[5] Defendants also originally challenged Ms. Campbell's constitutional defamation claim on the basis that she did not allege that a defamatory statement was made *by Defendants* as is required for a "reputation-plus" claim. *See* Defs.' Mem. P. & A. Supp. Mot. Dismiss 5–6, ECF No. 7. However, because Ms. Campbell's claim survives the motion to dismiss stage on at least a "stigma or disability" theory, the Court need not address at this stage whether the complaint alleges that Defendants made a defamatory statement to support a "reputation-plus" theory as well. The Court notes that the allegations in the complaint—that the District terminated Ms. Campbell at the same time it disseminated false, derogatory information to the press—may support such a theory, and Ms. Campbell may have too hastily focused on a "stigma or disability" theory. Regardless, she may take discovery under both theories.

## B. D.C. False Claims Act (Count II)

Ms. Campbell's second claim for relief is based on the DCFCA, which prohibits retaliation against employees for actions taken in furtherance of reporting a false claim. *See* D.C. Code § 2-381.04 (2001). "To establish a [DCFCA] retaliation claim, a plaintiff must show (1) that he or she engaged in protected activity, (2) that the defendant had knowledge that the plaintiff engaged in such protected activity, (3) that the defendant terminated the plaintiff's employment, and (4) that there was a causal connection between the protected activity and the defendant's termination of the plaintiff's employment." *See Payne v. District of Columbia*, 773 F. Supp. 2d 89, 97 (D.D.C. 2011) (citing *Kakeh v. United Planning Org., Inc.*, 655 F. Supp. 2d 107, 115 (D.D.C. 2009)). The pleading need not meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b); it need only satisfy Rule 8's general pleading requirements. *See id.* The parties dispute whether Ms. Campbell has pleaded that her actions were "in furtherance of" a false claims action, and therefore whether her actions meet the "protected activity" requirement. *See* Defs.' Mem. P. & A. Supp. Mot. Dismiss 8, ECF No. 7; Pl.'s Mem. Opp'n Mot. Dismiss 8–9, ECF No. 9.

The elements of a DCFCA retaliation claim mirror, and are analyzed in a similar fashion to, a retaliation claim arising under the federal False Claims Act ("FCA"). *See, e.g.*, *Payne*, 773 F. Supp. 2d at 97; *see also* Pl.'s Mem. Opp'n Mot. Dismiss 8–9, ECF No. 9 (quoting case law applying the FCA). "For the first requirement—engaging in protected activity—'it is sufficient that a plaintiff be investigating matters that reasonably could lead to a viable False Claims Act case.'" *United States ex rel. Brown v. Aramark Corp.*, 591 F. Supp. 2d 68, 76 (D.D.C. 2008) (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998)) (applying the FCA). However, "an employee's investigation of nothing more than his

employer's non-compliance with federal or state regulations" is not a protected activity. *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998) (citing *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (D.C. Cir. 1996)). "To be covered by the False Claims Act, the plaintiff's investigation must concern *false or fraudulent* claims." *Id.* (emphasis added) (internal quotation marks omitted).

Ms. Campbell's complaint fails to plead the "protected disclosure" required to support a DCFCA claim. Although she alleges that Mr. Turnage favored particular vendors with his "open door policy" and that she brought attention to "several issues" and "inconsistencies" with CGI's proposed contract, *see* Compl. ¶¶ 18, 22–23, ECF No. 1; Pl.'s Mem. Opp'n Mot. Dismiss 9, ECF No. 9, such allegations do not rise to the level of investigating *false or fraudulent* claims. Ms. Campbell's allegations relate to the bidding and negotiation process for a government contract and do not allege that CGI or anyone else submitted false records or demands for payment. *See Payne*, 773 F. Supp. 2d at 99; *see also United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551 (D.C. Cir. 2002) ("The FCA . . . attaches liability, not to underlying fraudulent activity, but to the claim for payment." (internal quotation marks omitted)). Although Ms. Campbell may have suspected that the bidding process for the DCAS and HIT Projects were tainted by impropriety, "[d]isclosing wasteful procedures or practices . . . does not amount to an investigation of false or fraudulent claims." *Payne*, 773 F. Supp. 2d at 98 (citing *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1479 (9th Cir. 1996)). The Court will therefore dismiss Count II of the complaint, but will also grant Ms. Campbell leave to amend her complaint to fortify her factual allegations for this claim.

### C. D.C. Whistleblower Protection Act (Count III)

The DCWPA provides that "[a] supervisor shall not take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure . . . ." D.C. Code § 1-615.53 (Supp. 2012). To plead a prima facie case of retaliation under the DCWPA, a plaintiff must plead "(1) a protected disclosure; (2) a prohibited personnel action; and (3) a causal connection between the protected disclosure and the prohibited personnel action, such that the protected disclosure was at least a contributing factor in the personnel action." *Bowyer v. District of Columbia*, 910 F. Supp. 2d 173, 191–92 (D.D.C. 2012) (internal quotation marks omitted); *see also Freeman v. District of Columbia*, 60 A.3d 1131, 1141 (D.C. 2012). Under the DCWPA, a "protected disclosure" is defined as

> any disclosure of information, . . . including a disclosure made in the ordinary course of an employee's duties by an employee to a supervisor or a public body that the employee reasonably believes evidences:
>
> (A) Gross mismanagement;
>
> (B) Gross misuse or waste of public resources or funds;
>
> (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;
>
> (D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or
>
> (E) A substantial and specific danger to the public health and safety.

D.C. Code § 1-615.52(a)(6) (Supp. 2012). "For there to be a protected disclosure, 'an employee must disclose such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people.'" *Wilburn v. District of Columbia*, 957 A.2d 921, 925 (D.C. 2008) (quoting *White v. Dep't of the Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004)). As with

Ms. Campbell's DCFCA claim, the parties' primary dispute is whether she sufficiently pleads the required protected disclosure. *See* Defs.' Mem. P. & A. Supp. Mot. Dismiss 9, ECF No. 7; Pl.'s Mem. Opp'n Mot. Dismiss 9–10, ECF No. 9.

Ms. Campbell argues that four of her allegations "support a claim of gross mismanagement of the DHCF office [and] an abuse of power and gross misuse of public funds": (1) her objections to Mr. Turnage's "open door policy"; (2) that CGI was being unfairly favored in the planning for the DCAS Project; (3) that CGI's proposed contract for the HIT Project lacked a liquidated damages clause and was inconsistent with its best and final offer; and (4) that Mr. Turnage did nothing in response to CGI's resistance to change the HIT Project contract. *See* Pl.'s Mem. Opp'n Mot. Dismiss 9–10, ECF No. 9 (citing Compl. ¶¶ 18–19, 23–26, ECF No. 1). The latter three of these allegations do not support a DCWPA claim in the complaint as currently drafted. The complaint does not allege that Ms. Campbell actually disclosed to anyone her belief that CGI was being unfairly favored, nor does it allege that she reported Mr. Turnage's failure to push back against CGI's resistance to change the HIT Project contract. Ms. Campbell does allege that she raised several issues with the proposed HIT Project contract during a meeting with COO staff and the DHCF contract division lead, *see* Compl. ¶ 23, ECF No. 1, but CGI's insistence on favorable contract terms during the negotiation phase does not rise to the level of gross mismanagement or misuse of public resources. It is normal for parties to seek favorable terms during the negotiation of a contract.

Ms. Campbell's allegation that she objected to Mr. Turnage's "open door policy," however, does support a claim under the DCWPA. It is plausible that an administrative agency director's alleged policy of opening his door only to pre-selected, favored vendors would lead a reasonable person to believe that there had been an "[a]buse of authority in connection with the

13

administration of a public program or the execution of a public contract . . . ." D.C. Code § 1-615.52(a)(6)(C); *see also Freeman*, 60 A.3d at 1141 ("The eligibility of a disclosure for protection under the DCWPA thus 'hinges not upon whether the [conduct] was ultimately determined to be illegal, but whether [the plaintiff] reasonably believed it was illegal.'" (first alteration in original) (quoting *Zirkle v. District of Columbia*, 830 A.2d 1250, 1260 (D.C. 2003))). Defendants respond that Ms. Campbell's objection to the policy "at some unspecified 'time in the past'" stops short of showing her entitlement to relief. *See* Defs.' Reply Supp. Mot. Dismiss, ECF No. 10. But the lack of specificity as to time does not make it implausible that she raised the objection at all. And while an unspecified length of time between a plaintiff's protected disclosure and her termination may present difficulty in proving causation, *see Crawford v. District of Columbia*, 891 A.2d 216, 218–19 (D.C. 2006) (holding that a plaintiff must show that the protected disclosure was a "contributing factor" to her dismissal), an argument Defendants have not raised, the Court does not find it appropriate to dismiss the claim at the pleading stage on that ground. The Court will therefore deny Defendants' motion to dismiss Count III.

### D. Wrongful Termination Against Public Policy (Count IV)

Ms. Campbell's fourth claim is for wrongful termination against public policy in violation of D.C. common law. "An employee who serves at the will of his or her employer may be discharged 'at any time and for any reason, or for no reason at all.'" *Liberatore v. Melville Corp.*, 168 F.3d 1326, 1329 (D.C. Cir. 1999) (quoting *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991)). "D.C. law thus presumptively bars wrongful termination claims brought by at-will employees." *Holman v. Williams*, 436 F. Supp. 2d 68, 76 (D.D.C. 2006). However, the presumption against wrongful termination claims does not apply where "the sole

14

reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation[,]" *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 34 (D.C. 1991), or where the employee's claim is "solidly based on a statute or regulation that reflects the particular public policy to be applied," *Carl v. Children's Hosp.*, 702 A.2d 159, 163 (D.C. 1997) (en banc) (Terry, J., concurring). *See also Holman*, 436 F. Supp. 2d at 76 (discussing *Adams* and *Carl*).

Defendants argue that Ms. Campbell's common law claim must fail because it is supported by the same allegations as her DCWPA claim. Defs.' Mem. P. & A. Supp. Mot. Dismiss 9–11, ECF No. 7. Where the D.C. Council has squarely addressed the issue in the DCWPA, the D.C. Court of Appeals has "decline[d] to recognize a novel, competing cause of action for wrongful discharge at common law." *Carter v. District of Columbia*, 980 A.2d 1217, 1226 (D.C. 2009). Allowance of a common law claim under such circumstances would undermine the legislature's prerogatives. *See id.* But Ms. Campbell's wrongful termination claim is not based on her protected disclosures under the DCWPA. Rather, it is based on her alleged "refus[al] to modify the CBE guidelines for the DCAS policy" at Defendants' instruction. Compl. ¶ 97, ECF No. 1. A refusal to *participate* in circumventing D.C. policy is not the same as *disclosing* others' violation of that policy. Her wrongful termination claim is thus not founded upon the DCWPA, but is instead based on the CBE guidelines, which require that the District subcontract to CBEs at least 35 percent of the dollar volume of all government contracts in excess of $250,000. *See* D.C. Code § 2-218.46(a)(2) (2001).[6] Thus, as properly

---

[6] Although the complaint does not cite the relevant portion of the D.C. Code, it does mention the CBE guidelines by name, thus putting Defendants on notice as to the nature of Ms. Campbell's wrongful termination claim. *See* Compl. ¶ 27, ECF No. 1; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." (omission in original) (internal quotation marks omitted) (citation omitted)).

characterized, Defendants have not demonstrated that Ms. Campbell's wrongful termination claim is superseded by the DCWPA.

The cases cited by Defendants are not to the contrary. In *Carter v. District of Columbia*, 980 A.2d 1217 (D.C. 2009), the plaintiff argued that she was fired for reporting violations of municipal personnel regulations. Thus, her wrongful termination claim was based on the act of reporting—not refusing to participate—and thus could have been covered by a DCWPA claim. *See id.* at 1225–26. Similarly, in *McManus v. MCI Commc'ns Corp.*, 748 A.2d 949 (D.C. 2000), the D.C. Human Rights Act was the public policy allegedly breached. *See id.* at 957. That statute already provides a remedy for retaliatory termination itself, and so the Court rejected the application of a wrongful termination claim. *See id.* The CBE policies, in contrast, do not contain a retaliation or wrongful termination provision. The Court will therefore deny Defendants' motion to dismiss Count IV.

### E. Official Capacity Liability

Finally, Defendants move to dismiss all four claims against Mr. Turnage as duplicative of Ms. Campbell's claims against the District of Columbia. *See* Defs.' Mem. P. & A. Supp. Mot. Dismiss 11–14, ECF No. 7.[7] "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). Where both the employer and an officer in his official capacity are named defendants, it is generally "redundant and an inefficient use of judicial resources" to allow both claims to go

---

[7] Defendants' "duplication" argument goes only to claims asserted against Mr. Turnage in his official capacity. Defendants also argued that Mr. Turnage is entitled to immunity in his individual capacity, *see* Defs.' Mem. P. & A. Supp. Mot. Dismiss 12–14, ECF No. 7, but Ms. Campbell responded (and the complaint makes clear) that she only sues Mr. Turnage in his official capacity, *see* Pl.'s Mem. Opp'n Mot. Dismiss 11–12, ECF No. 9. The Court therefore need not address Defendants' immunity arguments.

forward. *Cooke-Seals v. District of Columbia*, 973 F. Supp. 184, 187 (D.D.C. 1997). This principle has been extended both to section 1983 claims and claims under D.C. law. *See, e.g.*, *Atchinson v. District of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996) (section 1983); *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 49 (D.D.C. 2005) (D.C. law).

Ms. Campbell presents no logical justification for maintaining a suit against Mr. Turnage in his official capacity where she is also suing his employer, the District of Columbia.[8] Instead, she points out that the court allowed an official capacity claim to go forward in *Payne v. District of Columbia*, 773 F. Supp. 2d 89, 102 (D.D.C. 2011). However, the court in *Payne* did not substantively analyze the issue, and it is not clear that the defendants in that case even raised it. The Court is unconvinced that it should go against the great weight of authority to maintain Ms. Campbell's duplicative claims against both the District of Columbia and Mr. Turnage. The Court will therefore merge the claims and dismiss Mr. Turnage as a party.

## V. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion to dismiss Ms. Campbell's DCFCA claim, but will deny their motion to dismiss her constitutional defamation, DCWPA, and wrongful termination claims. The Court will also merge the claims against Mr. Turnage in his official capacity with those against the District of Columbia, and dismiss Mr. Turnage as a party to this action. Ms. Campbell will be given leave to amend her

---

[8] Ms. Campbell misses the mark by arguing that Mr. Turnage should remain in the case because he was the alleged wrongdoer, as that argument confuses the difference between a personal capacity suit and an individual capacity suit. Mr. Turnage is named in his official capacity because of his position, not his actions. And when he leaves that position, he would be substituted as a defendant, regardless of his involvement in the alleged wrongdoing. *See* Fed. R. Civ. P. 25(d).

complaint. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 23, 2013                                            */s/ Rudolph Contreras*
                                                                                           RUDOLPH CONTRERAS
                                                                                           United States District Judge