## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

JENNIFER B. CAMPBELL

                Plaintiff,

      v.                              Case No. 1:12-cv-01769-RC

DISTRICT OF COLUMBIA,

                Defendant.

### THE DISTRICT OF COLUMBIA'S MOTION FOR SUMMARY JUDGMENT

       The District of Columbia pursuant to Fed. R. Civ. P. 56 and LCvR 7(h), request judgment on all claims. Plaintiff cannot succeed on the merits of her constitutional defamation claim because the information that the District provided about Plaintiff in response to an inquiry from a reporter was true. Moreover, Plaintiff has worked in her chosen profession since her termination Moreover, Plaintiff has worked in her chosen profession since her termination and had the opportunity for a name clearing hearing that satisfied the requirements of due process. Her claim under the Whistleblowers Protection Act fails because she has no evidence that the District's legitimate, independent reason for terminating her employment was pretext for retaliation. Finally, Plaintiff is not entitled to recover on her claim for termination in violation of public policy because both her claim to have reported misconduct and to have refused to break contracting rules are covered by the WPA.

       For these reasons, the District requests:

   1)  that this Court grant its Motion pursuant to Rule 56; and

   2)  enter judgment for the District on all claims.

SEPTEMBER 2, 2014             Respectfully submitted,

                            IRVIN B. NATHAN

Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

/s/ Jonathan H. Pittman
JONATHAN H. PITTMAN    [D.C. Bar No. 430388]
Chief, Civil Litigation Division Section III

/s/ Sarah L. Knapp
SARAH L. KNAPP [470008]
Assistant Attorney General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001
(202) 724-6528
Email:  sarah.knapp@dc.gov

/s/ Brant W. Martin
BRANT MARTIN [1010510]
Assistant Attorney General
441 Fourth Street, NW, Suite 630 South
Washington, DC 20001
(202) 442-9840
Email: brant.martin@dc.gov

*Counsel for Defendant*

**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

JENNIFER B. CAMPBELL

                Plaintiff,

    v.                            Case No. 1:12-cv-01769-RC

DISTRICT OF COLUMBIA,

                Defendant.

## <u>ORDER</u>

Upon consideration of Defendants' Motion for Summary Judgment, and any opposition thereto, it is this _____ day of _____, 20___, hereby ORDERED that:

1) Defendants' Motion is hereby GRANTED; and further

2) JUDGMENT is entered for Defendant on all claims.

_____
DATE

                                 _____
                                 JUDGE RUDOLPH CONTRERAS

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

JENNIFER B. CAMPBELL

            Plaintiff,

    v.

DISTRICT OF COLUMBIA,

           Defendant.

Case No. 1:12-cv-01769-RC

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff was terminated from her position as the Chief Operating Officer of the District's Department of Healthcare Finance ("DHCF") because she was accused of attempting to steer an important contract to a particular vendor. Neither Plaintiff's termination, nor the publicity that surrounded it should subject the District of Columbia to liability. To the contrary, the undisputed facts show that the District is entitled to judgment on each of Plaintiff's remaining claims.

In June of 2012, Wayne Turnage, DHCF's Director, received an unsolicited call from a vendor who claimed that Plaintiff was attempting to steer the contract to create the District's new Health Insurance Exchange towards a contractor with whom she had a personal relationship. Turnage immediately began to investigate these allegations. He also informed his superiors in the Executive Office of the Mayor about these allegations. Within days of the initial phone call, Turnage, with input from others in the executive branch, had decided to terminate Plaintiff and had referred the allegations against her to the District's Office of the Inspector General.

At some point during or shortly after this process, a reporter for the Washington City Paper found out about the allegations against Plaintiff, which he brought to the attention of the Mayor's press officer. There is no evidence that anyone within the District government provided

this information to reporter.  However, in response to his inquires, Turnage and the Mayor's office provided truthful information about the allegations against Plaintiff and the District's intended response.

Plaintiff claims that she was constitutionally defamed by these truthful responses to the reporter's inquiries.  Plaintiff cannot succeed on the merits of her constitutional defamation claim because the information that the District provided about Plaintiff was not defamatory.  Moreover, Plaintiff has worked in her chosen profession since her termination and had the opportunity for a name clearing hearing that satisfied the requirements of due process.  Plaintiff also claims that true reason for her termination was her refusal to bend the rules for a different contract related to the District's Health Insurance Exchange, in violation of the Whistleblower Protection Act ("WPA") and public policy.  Her WPA claim fails because she has no evidence that the District's legitimate, independent reason for terminating her employment was pretext for retaliation. Finally, Plaintiff is not entitled to recover on her claim for termination in violation of public policy because both her claim to have reported misconduct and to have refused to break contracting rules are covered by the WPA.

For these reasons, which are discussed in detail below, the Court should grant judgment to the District on each of Plaintiff's claims.

## SUMMARY OF FACTS

In 2008, Plaintiff was hired by the D.C. Department of Health Care Finance ("DHCF") as Associate Director of the Office of Utilization Management within DHCF's Health Care Accountability Administration. Eventually, Ms. Campbell was promoted to Chief Operating Officer. *See* Compl. [1] ¶¶ 15, 16.   As COO, Plaintiff oversaw the bidding process for contracts, including contracts associated with the District's new healthcare exchange.  See Id.

2

¶¶ 17 – 25.  This position was in the Excepted Service which meant that Plaintiff served at the pleasure of the Mayor.  See D.C. Code § 1-609.3.  Prior to holding the COO position, Plaintiff held other positions at DHCF.  Exh. A, Pl.'s Dep. 22:2 – 24:1.

Since leaving the District government, Plaintiff has looked for work in "healthcare on the hospital side.  On the provider side insurance consulting" and in sales and community health.  *Id*. 81:6 – 81:15.   Plaintiff has worked two consulting contracts, one to develop a business plan for an intermediate care facility and a second to provide public health training in Birmingham, Alabama;  Raleigh, North Carolina; and Atlanta, Georgia through a Washington, D.C. based company.  *Id.* at 81:16 – 83:22.

Plaintiff worked closely with Wayne Turnage, Director of DHCF from 2011 until she was terminated in June of 2012.  *Id.* 25:14 – 26:2.  In August/September of 2011, Turnage accepted meetings with vendors who were potential bidders on the contract to create the Healthcare Benefit Exchange ("HBX contract").  *Id*. 42:3 – 9. Plaintiff had reservations about these meeting, which she expressed to Turnage starting "after the first meeting request that he asked me to be a part of" in September of 2011. *Id.* 42:10 – 20.

Turnage had the meetings anyway and Plaintiff attended.  *Id*. at 44:19 - 45:6.  One of these meetings was with a company called CGI.  Plaintiff continued to express her concerns to Turnage and other DHCF staff.  *Id*. 45:7 – 48:15.

Plaintiff suggested that DHCF set aside time where any potential exchange vendor could come in and give demonstrations of their products.  *Id*.  50:4 -51:8. Turnage agreed that this was a good idea and attended the demonstration.  *Id.* 51:22 – 52:4.  After the demonstrations, Plaintiff told Turnage that they should not have any more meetings with individual vendors.  *Id.*  66:3 – 66:13.  Plaintiff never "went over his head" with her concerns.  *Id.* 66:14 -17.

Turnage put Plaintiff up for promotion to COO in or around April of 2012. *Id*. 23:21 –
24:17.  When Plaintiff became COO, CGI had been awarded DHCF's Health Information
Technology ("HIT") contract, but the contract had not been executed.  *Id*. at 53:9 – 54:17.  The
HIT contract "was placed on [Plaintiff's] desk to sign" after she became COO.  *Id.* 54:16 –
55:12.  According to Plaintiff, Turnage "would ask [her] if it was signed."  *Id*. 55:13 -20.

Plaintiff believed that the contract was missing "some pertinent pieces that we typically
have in all of contracts" so she did not sign it right away.  *Id.* 55:21 – 56:9.  Plaintiff does not
recall what Turnage said when she told him about her concerns.  *Id.* 55:14 -16.  Plaintiff worked
with the District's Office of Contracting and Procurement to get these pieces back in the contract
and kept Turnage informed about her progress.  *Id.* 57:12 -59:9.

At some point during this process Turnage told Plaintiff "Well you know, we're up
against the timelines.  I wouldn't worry about it too much.  We should just go ahead and execute
it."  *Id.* 59:15 – 17.  Plaintiff told Turnage that she was uncomfortable doing that and he
responded "Well, just keep me updated or keep me posted, but we have to meet these timelines."
*Id*. 59:22 – 60:8.

On June 2, 2012 Turnage received a call from Holly Ploog, the Vice President of CGI,
the HIT contractor.   Exh. B, District's Responses to Interrogatories (DC Rog. Resp.) No. 1.
Ploog told Turnage that she had she had been contacted, unsolicited, by Plaintiff.  Ploog related
that Plaintiff had told her it was in CGI's interest to consider Darryl Wiggins as a minority
partner for an upcoming project. *Id.*   During an in person meeting on June 4, 2012, with Turnage
and his Chief-of-Staff, Melissa Byrd, Ploog confirmed her earlier allegations.  *Id.*   During the
meeting, Ploog further explained that Plaintiff told her she should not choose a company called
Compass for a minority partner because Compass had too much work with the District and

4

would be conflicted out of the upcoming contract.  Ploog told Turnage and Byrd that Plaintiff

said that Ploog should consider Wiggins instead.  *Id.*

On June 3, 2012, Turnage spoke with Anthony Onyewuchi, the owner of Compass.

Onyewuchi told Turnage that Plaintiff had been meeting with minority vendors to put together a

team to submit a bid as the prime contractor for an upcoming contract.  *Id.*  Onyewuchi told

Turnage that Compass and CGI had been considering a partnership until CGI backed out at

Plaintiff's instruction.  *Id*. and No. 2.

Because of the seriousness of the allegations that Ploog and Onyewuchi made against

Plaintiff, Turnage decided to put Plaintiff on administrative leave with pay effective June 4,

2012.  *Id.*  Turnage consulted the DC Office of Human Resources and the Office of the Mayor in

making this decision.  *Id.*  Turnage notified the DHCF contracting staff that Plaintiff would be on

leave and informed them of the allegations against Plaintiff.

On June 4, Turnage concluded his primary investigation into the allegations against

Plaintiff.  Ex. C, Email from Turnage to Murphy, Otero, Stokes dated 6/4/12.  After concluding

his primary investigation, Turnage decided to terminate Plaintiff's employment at DHCF.  Email

from Turnage to Murphy, Otero, Stokes dated 6/4/12.

Later, Turnage spoke with Darryl Wiggins and Cedric Simon about the allegations

against Plaintiff. DC Rog. Resp. Nos. 1 & 2.  Turnage spoke with Bonnie Norton, a member of

the contractor selection team about the investigation.  *Id.*

Sometime in early June of 2012, Alan Suderman, of the Washington City Paper contacted

Pedro Ribeiro, who was at that time Director of Communications in the Executive Office of the

Mayor, and asked about Plaintiff.  Exhibit D, Ribeiro Dep. 5:13 – 6:6.  Suderman asked Ribeiro

"if [he] knew who Jennifer Campbell was and what was going on with her." *Id.* 6:10 – 11.

Suderman asked Ribeiro for information about Plaintiff. *Id.* 6:22 – 7:4.  At the time of the call from Suderman, Ribeiro did not know about the allegations against Plaintiff.  Id. 6:12 – 21.

Ribeiro spoke to Chris Murphy, the Mayor's Chief of Staff, about Suderman's call.  In response, Murphy gave Ribeiro copies of emails between DHCF and the Executive Office of the Mayor about Plaintiff and the actions being taken in response to the allegations against her.  *Id.* 7:10 – 8:10; Exhibit E, Murphy Dep. 6:15-7:6.  Murphy and Ribero decided to give information to Suderman because Suderman was already aware of alleged inappropriate conduct by Plaintiff and Mr. Murphy and Mr. Ribero thought it important that the public and media understand that the District of Columbia government took allegations of impropriety by District employees very seriously and that the District was taking appropriate action to address the allegations instead of glossing over or ignoring them.  *See* Ribero Dep. 12:2-6; Murphy Dep. 6:13-7:3; 8:4-17; 10:11-21.  Ribeiro allowed Suderman to review these emails at the Mayor's Office; he did not provide copies to Suderman or allow Suderman to make copies.  *Id.* 8:15 – 9:3.

Ribeiro believed that he was giving Suderman this information "on background."  *Id.* 11:16- 17.  Neither Ribeiro nor Murphy know how Suderman found out about the allegations against Plaintiff.  *Id.* 12:11 -13; Murphy Dep. 7:19-22.  No one else from the Mayor's office had any contact with the press regarding Plaintiff.  Ribeiro Dep. 12:20 – 13:8.  There is no evidence that anyone within the District Government spoke with Suderman prior to Suderman's call to Ribeiro.

On June 10, 2012, Suderman called Turnage and told him that he had three of Turnage's emails about Plaintiff.  Suderman would not tell Turnage how he got the emails.  DC Rog. Resp. No. 8.  Turnage declined to make any official comment for the record.  *Id.*  Turnage did,

however, send a series of emails to Suderman to make some clarifications. *Id.*; Ex. F, Turnage

Emails to Suderman (Bates Nos. DHCF FY14-03 12-16, 20-24).

 The first email clarified the content of one of the emails Suderman represented were

already in his possession.  Turnage explained that he directed DHCF staff to contact all vendors

and clarify that any instruction from DHCF regarding who the vendor should hire was

inappropriate and unethical. Turnage requested that Suderman emphasize what Turnage had

already stated in one of his emails, that the "process should be conducted confidentially for the

protection of both the agency and out of respect for Jennifer's potential innocence. . . ." .  DC

Rog. Resp. No. 8; Turnage Emails (Bates Nos. DHCF FY14-03 22-24).  The contents of the

email forwarded within the first email from Director Turnage to Suderman laid out the

allegations Director Turnage had received regarding Plaintiff and explained his plan to respond

to and investigate the allegations.  *See id.*

 The second email asked Suderman not to publish an allegation that there was a personal

relationship between Plaintiff and one of the individuals she allegedly directed Compass to hire.

Turnage made this request because of the potential harm to Plaintiff and her family.  DC Rog.

Resp. No. 8; Turnage Emails (Bates Nos. DHCF FY14-03 20-21).  The contents of the email

forwarded within the second email from Director Turnage to Suderman gave updates on the

actions taken by Director Turnage and DHCF in response to the allegations against Plaintiff.  *See*

Turnage Emails (Bates Nos. DHCF FY14-03 20-21).

 In the final email, Turnage attempted to correct typos and syntax errors in one of the

emails that he believed Suderman already had and stated off the record that Plaintiff's

termination would be for cause.  DC Rog. Resp. No. 8; Turnage Emails (DHCF FY14-03 12-14).

The contents of the email forwarded within the third email from Director Turnage to Suderman

discussed a meeting with Darryl Wiggins, one of the individuals named in the allegations against Plaintiff, and gave updates on his response to the allegations.  *See id.*

On or about June 11, 2012, Turnage and Byrd met with Tim Craig, a reporter for the Washington Post. Turnage confirmed Campbell's termination. No documents were provided to Craig. *Id.*  Both the Washington Post and the Washington City Paper published stories about the allegations against Plaintiff and the actions being taken by the District. *See* Exhibit G, Alan Suderman, *Health Care Finance COO Fired Over Contract Steering Allegations*, WASHINGTON CITY PAPER, June 11, 2013; Exhibit H, Tim Craig, *D.C. official is fired over contract allegations*, WASHINGTON POST,  June 12, 2013.

Turnage referred the allegations against Plaintiff to the Office of the Inspector General (OIG).  Email from Turnage to Murphy, Otero, Stokes dated 6/4/12 The OIG investigation "concluded that [Plaintiff] violated the District of Columbia standards of conduct when she abused her position in overseeing a contract matter, which resulted in her creating the appearance of giving preferential treatment to a person, creating an appearance of losing complete independence or impartiality, and affecting adversely the confidence of the public in the integrity of government."  Ex. I, Letter from OIG to Turnage dated 9/24/13 (Findings Letter).  Plaintiff, through counsel, declined to be interviewed for the investigation. Ex. J, Note dated 8/20/13.  "Because Dr. Campbell is no longer employed with the District government, the OIG [ ] closed its file."  Findings Letter.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where, as here, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." FED. R. CIV. P. 56(c); *see also Brehm v. Dep't of Defense*, 577 F. Supp. 2d 446, 448 (D.D.C. 2008). "[C]ourt[s] must look to the substantive law on which each claim rests" in determining which facts are material. *Brehm*, 577 F. Supp. 2d at 448 (citation omitted). "A genuine issue is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action." *Id.* (internal quotation marks and citation omitted).

To survive summary judgment, the nonmoving party must present evidence to support each essential element of his or her claims. *Celotex v. Cattret*, 477 U.S. 317, 322-23 (1986). It "may not rely solely on allegations or conclusory statements" and must instead "present specific facts that would enable a reasonable jury to find in its favor." *Brehm*, 577 F. Supp. 2d at 448 (citations omitted). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. This basic procedural tenant prohibits the plaintiff from going forward here.

## ARGUMENT

## I.     PLAINTIFF CANNOT SHOW CONSTITUTIONAL DEFAMATION.

The Court should grant the District summary judgment on Plaintiff's constitutional defamation claim. To survive summary judgment, "[a] claim for deprivation of a liberty interest without due process based on the defamatory statements of government officials in combination with a termination may proceed on one of two theories," either a "reputation-plus" claim or a "stigma or disability" claim. *Holman v. Williams*, 436 F. Supp. 68, 78 (D.D.C. 2006); *see O'Donnell v. Barry*, 148 F.3d 1126, 1139-40 (D.C. Cir. 1998). Under either theory, Plaintiff's constitutional defamation claim fails.

### A.     Plaintiff Cannot Survive Summary Judgment on a Reputation-Plus Theory of Constitutional Defamation.

A "reputation-plus" claim requires that Plaintiff establish official defamation in conjunction with her termination.  *See Aguirre v. S.E.C.*, 671 F. Supp. 2d 113, 119 (D.D.C. 2009).  Plaintiff, however, experienced no official defamation by the District in conjunction with her termination as Chief Operating Officer of DHCF.  To succeed on a claim of defamation, Plaintiff must prove each of four elements.  *See Rosen v. American Israel Public Affairs Committee, Inc.*, 41 A.3d 1250, 1255 (D.C. 2012).  First, Plaintiff mush show that the District "made a false *and* defamatory statement concerning" her.  *Id.* (emphasis added).  Second, she must establish that the District "published the statement without privilege to a third party."  *Id.* Third, she must prove that the District's "fault in publishing the statement amounted to at least negligence;" and fourth, " that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm."  *Id.*

      1.   <u>No Statements Made Regarding Plaintiff Were False or Defamatory.</u>

A statement can be defamatory "if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community," but the statement "must make the plaintiff appear odious, infamous, or ridiculous."  *Rosen*, 41 A.3d at 1256 (internal citation omitted); *Clawson v. St. Louis Post-Dispatch, L.L.C.*, 906 A.2d 308, 313 (D.C. 2006). Importantly, a statement must be *both* defamatory and provably false.  *Rosen*, 41 A.3d at 1256 (internal citation omitted).  Accordingly, a statement of opinion can be defamatory "if—but only if—it has an explicit or implicit factual foundation and is therefore objectively verifiable."  *Id.* (internal citation omitted).  If, however, "it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."  *Id.* (internal citation omitted).

Plaintiff alleges she was defamed when emails written by DHCF Director Wayne Turnage were subsequently released to and quoted by reporter Alan Suderman in a Washington City Paper article and then later quoted again in a Washington Post article. *See* Pl.'s Ans. to District Interrogs. 11; Compl. ¶¶ 48-67. Though Plaintiff does not specify what portions of the emails, exactly, were allegedly defamatory, nothing in any of the emails is false or defamatory. Instead, the emails simply lay out the fact that Turnage had been informed of allegations regarding Plaintiff, what the allegations were and who made them, the steps that Turnage was taking in investigating the allegations, and the fact that he had placed Plaintiff on administrative leave.[1] *See* SOMF 51-57; Turnage Emails to Suderman (Bates Nos. DHCF FY14-03 12-16, 20-24). The actual portions of the emails quoted in the Washington City Paper and Washington Post are even more limited, and are neither false nor defamatory. *See* Alan Suderman, *Health Care Finance COO Fired Over Contract Steering Allegations*, WASHINGTON CITY PAPER, June 11, 2013; Tim Craig, *D.C. official is fired over contract allegations*, WASHINGTON POST, June 12, 2013. Accordingly, because Plaintiff cannot demonstrate that any statement by a District official regarding her was *both* false and defamatory, Plaintiff cannot succeed against the District on a "reputation plus" theory of constitutional defamation.

   2. The Release of the Emails Is Protected by the Common Interest Privilege.

"A statement is protected by the common interest privilege if it is "(1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has or honestly believes he has a duty (3) to a person who has such a corresponding interest or

---

[1] Indeed, the Office of the Inspector General confirmed that Plaintiff "violated the District of Columbia standards of conduct when she abused her position in overseeing a contract matter, which resulted in her creating the appearance of giving preferential treatment to a person, creating an appearance of losing complete independence or impartiality, and affecting adversely the confidence of the public in the integrity of government." SOMF 60.

duty." *Payne v. Clark*, 25 A.3d 918, 924-25 (quoting *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C.1990) (formatting omitted).  To determine if the interest applies, a court "looks to the primary motive by which the defendant is apparently inspired; and, the fact that [the defendant] feels resentment and indignation towards the plaintiff and enjoys defaming him will not forfeit the privilege so long as the primary purpose [of the statement] is to further the interest which is entitled to protection."  *Id.* at 925-26.

After the Court determines a statement is protected by the common interest privilege, "the defendant 'will be presumed to have been actuated by pure motives in its publication, and in order to rebut this presumption, express malice or malice in fact must be shown by the plaintiff." *Id.* at 925 (citation omitted).  The plaintiff must prove malice with extrinsic evidence "[u]nless the statement itself is so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the defendant was actuated by express malice."  *Id.* (citation omitted).  Moreover, malice in the context of the common interest privilege as opposed to the First Amendment "is the equivalent of bad faith. It is the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will."  *Id.* (citation omitted).  The common interest malice standard "looks to ill will or enmity as the primary motive of the defendant."  *Id.* (citation omitted).  However, to prove malice with extrinsic evidence, a plaintiff must make a "substantial proffer . . . because the mere existence of ill will on the part of the publisher toward the subject of the publication does not defeat the publisher's privilege . . . ."  *Blodgett v. University Club*, 930 A.2d 210, 224 (D.C. 2007).

In the instant matter, Pedro Ribero, the Director of Communications of the Executive Office of the Mayor shared Turnage's internal emails regarding the allegations about Plaintiff

and Director's investigation and response with Suderman after Suderman approached Ribero about Plaintiff, asking what was going on with her and requesting whatever information Ribero could provide.  *See* SOMF 40-41.  After receiving Suderman's initial request for information, Ribero consulted with the Mayor's Chief of Staff, Christopher Murphy, who provided  Ribero with Turnage's emails to show Suderman.  *See id.* 43.  Murphy and Mr. Ribero decided to show the emails to Suderman because Suderman was already aware of alleged inappropriate conduct by Plaintiff and Murphy and Ribero thought it important that the public and media understand that the District of Columbia government took allegations of impropriety by District employees very seriously and that the District was taking appropriate action to address the allegations instead of glossing over or ignoring them.  *See id.* 44.  Neither Ribero nor Murphy knew how Suderman found out about the allegations against Plaintiff and there is no evidence on the record that someone with the District government spoke with Suderman prior to Suderman's call to Ribero.  *See id.* 46-47. No one else from the Mayor's office had any contact with the press regarding Plaintiff.  *See id.* 48.  Ribero is entitled to protection of the common interest privilege because Ribero released information based on a genuine interest of the public and the District: how seriously the District took allegations of impropriety regarding its employees.  Further, Plaintiff can point to no malice motivating the release of these emails.

Subsequently, Alan Suderman contacted Turnage regarding the emails, informing them that he already had the emails in his possession.  *See id.* 49.  Turnage declined to officially comment but, under the impression that the emails had been released to Suderman, forwarded the emails to make some clarifications.  *See id.* 51.   In sending the first email, Director Turnage explained that he directed DHCF staff to contact all vendors and clarify that any instruction from DHCF regarding who the vendor should hire was inappropriate and unethical.  *See id.* 52.  He

13

also requested that Suderman emphasize what Turnage had already stated in one of his emails, that the "process should be conducted confidentially for the protection of both the agency *and out of respect for Jennifer's potential innocence. . . . ." See id.* Turnage's second email asked Suderman not to publish an allegation that there was a personal relationship between Plaintiff and one of the individuals she allegedly directed Compass to hire. *See id.* 54.  Turnage made this request because of the potential harm to Plaintiff and her family. *See id.*  In the final email, Turnage attempted to correct typos and syntax errors in one of the emails that he believed Suderman already had and stated off the record that Plaintiff's termination would be for cause. *See id.* 56.

Turnage forwarded the emails to Suderman based on the reasonable belief that Suderman already had the emails, out of a genuine interest to the District and the public to clarify what steps the District was taking in response to the allegations and out of a genuine interest to Plaintiff in respecting Plaintiff's potential innocence and preventing allegations of a personal relationship between her and Simon from being released.  Plaintiff cannot point to any malice motivating Turnage's release of these emails.  Accordingly, the common interest privilege shields Turnage's release of the emails to Suderman.[2]

> 3.   The Release of the Emails Is not Actionable as a Matter of Law Regardless of Harm and the Emails Have Caused Plaintiff no Special Harm.

"A statement is defamatory as a matter of law ("defamatory per se ") if it is so likely to cause degrading injury to the subject's reputation that proof of that harm is not required to recover compensation." *See Franklin v. Pepco Holdings, Inc.*, 875 F.Supp.2d 66, 75 (D.D.C.

---

[2] On or about June 11, 2012, Turnage and Byrd met with Tim Craig, a reporter for the Washington Post. Turnage confirmed Campbell's termination. No documents were provided to Craig. *See* SOMF 58.  Plaintiff can point to no false and defamatory statements made by Turnage or Byrd during this meeting.

2012) (citing *Carey v. Piphus*, 435 U.S. 247, 262 (1978)).  Importantly, "[d]efamation as a matter of law generally consists of false statements that impute to the subject a crime, a repugnant disease, a matter adversely affecting the person's ability to work in a profession, or gross sexual misconduct."  *Id.*.  An allegation that a statement has hurt the plaintiff's reputation is insufficient to make a statement defamatory per se.  *See id.*  First, the release of Turnage's emails cannot qualify as defamatory per se because the emails themselves contain no false information- instead, they truthfully lay out the allegations brought Turnage's attention and how Turnage and DHCF was addressing those allegations.  *See* SOMF 51-57; Turnage Emails to Suderman (Bates Nos. DHCF FY14-03 12-16, 20-24).  Second, even if the emails contained false information, allegations by Plaintiff that the emails have hurt her professional reputation do not establish defamation per se, and Plaintiff cannot prove that release of the emails was "so likely to cause degrading injury to the subject's reputation that proof of that harm is not required to recover compensation," thereby rising to the level of defamation *per se*.  *Franklin*, 875 F.Supp.2d at 75.

Likewise, there is no evidence on this record of special harm sufficient to satisfy a claim of defamation.  Special harm is "limited to actual pecuniary loss."  *Id.* (quoting *FAA v. Cooper*, 132 S.Ct. 1441, 1451 (2012) (stating in addition that actual pecuniary loss must be specially pleaded and proved).  Plaintiff cannot prove that she suffered specific monetary loss as a result of the release of Director Turnage's emails.  Accordingly, the release of Director Turnage's emails cannot amount to defamation and Plaintiff cannot succeed on her constitutional defamation claim under a "reputation plus" theory.

B.   <u>Plaintiff Cannot Survive Summary Judgment on a Stigma or Disability Theory of Constitutional Defamation.</u>

To succeed on a "stigma or disability" claim, Plaintiff must "demonstrate that [the] government 'imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities.' " *McCormick v. District of Columbia*, 899 F. Supp. 2d 59, 65 (D.D.C. 2012) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972)).  Moreover, "[t]he nature of the allegedly defamatory statements is not necessarily central to a 'stigma or disability' claim," because the claim hinges on an official action that "has the effect of seriously affecting, if not destroying, a plaintiff's ability to pursue his chosen profession, or substantially reducing the value of his human capital."  *Holman*, 436 F. Supp. 2d at 80 (internal citation and formatting omitted).  Accordingly, "[t]he burden is on the plaintiff who seeks to make out a claim of interference with the right to follow a chosen trade or profession that is based exclusively on reputational harm to show that the harm occurred in conjunction with, or flowed from, some tangible change in status."  *Id.* 80 (internal citation and formatting omitted).

Plaintiff, however, can point to no affirmative record evidence that her termination from DHCF itself has prevented her from obtaining any specific job opportunity.   Furthermore, Plaintiff admits that since her termination from DHCF, she has worked as a consultant on two different  contracts, one developing a business plan for an intermediate care facility's expansion into another market and one doing public health training in Birmingham, Alabama;  Raleigh, North Carolina; and Atlanta, Georgia.  *See* SOMF 7.  Both of these consulting opportunities fall squarely within Plaintiff's chosen profession of healthcare administration.  Therefore, Plaintiff cannot establish that her termination from DHCF has foreclosed her freedom to take advantage of other employment opportunities.

Moreover, Plaintiff did not suffer a constitutional violation for the additional reason that she was given all the process she was due even if her termination infringed on a liberty interest. As the D.C. Circuit recently explained,

> [D]ue process requires only that [a plaintiff] have "an opportunity to clear his name." *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). The basic requirement in such a hearing is minimal: it must provide notice of the charges and an opportunity to refute them effectively. *Id.; Doe v. DOJ,* 753 F.2d 1092, 1112 (D.C.Cir.1985).

*McCormick v. D.C.,* 752 F.3d 980, 989 (D.C. Cir. 2014).  There, the Court found that although the terminated employee did not have an avenue to overturn his termination because he was a management employee, he could have brought an action in Superior Court seeking severance pay. *Id*. at 990.  This proceeding would effectively clear his name because severance is not available when a management employee is terminated for cause. *Id* (citing D.C. Code § 1–609.54, which sets out a schedule for management service employee severance).   Although Plaintiff was a member of the Excepted Services, she had the same opportunity to appeal the reason for termination in order to obtain severance pay. *See* D.C. Code § 1-609.03 (f).  Consequently, as in *McCormick,* even if the District deprived Plaintiff of a liberty interest, this deprivation was not without due process.  And the District is entitled to summary judgment here, as it was in *McCormick.*

## II.    PLAINTIFF HAS NO VIABLE CLAIM UNDER THE WPA BECAUSE SHE CANNOT SHOW THAT THE LEGITIMATE INDEPENDENT REASONS FOR HER TERMINATION WERE PRETEXTUAL.

No reasonable jury could find that the actual cause of Plaintiff's termination was anything other than what the District says it was – serious allegations about contract steering from two outside vendors.  As explained by then-Chief Judge Lamberth:

> The plaintiff carries the initial burden of establishing a *prima facie* case of retaliation. The burden then shifts to the defendant to show "by clear and

17

convincing evidence that the [adverse employment act] would have occurred for 'legitimate, independent reasons' even if [plaintiff] had not engaged in activities protected under the act.  If the defendant can articulate such a reason for the action, plaintiff then bears the burden of proving that the explanation for the action is a pretext. According to the D.C. Court of Appeals, the statute "shields an employee only to the extent the record supports a finding that he would not have been disciplined *except for* his status as a whistleblower." *Johnson,* 935 A.2d at 1119 (quoting *Crawford,* 891 A.2d at 222).

*Coleman v. Dist. of Columbia*, 09-CV-50 (RCL), 2012 WL 4465784 (D.D.C. Sept. 28, 2012) (emphasis in the original); *see also Anderson v. Ramsey,* 04-CV-56 (GK), 2006 WL 1030155 (D.D.C. Apr. 19, 2006) ("plaintiff must show that she made a protected disclosure, that the disclosure was a substantial, motivating, or contributing factor in the employers decision to discipline her and that the employer would not have taken the action for other legitimate reasons").  Plaintiff cannot show that the District would not have terminated her *except for* her purported status as a whistleblower.

Instead, the evidence shows that Plaintiff was terminated because two outside vendors made serious allegations that Plaintiff was steering an important contract to certain preferred vendors.  *See* SOMF 26-39. Turnage, Plaintiff's supervisor, started to investigate these allegations immediately after he was contacted.  *See id.*  At the same time, he began corresponding with the D.C. Office of Human Resources and his superiors at the Mayor's Office about how the District should respond.  *See* SOMF 33.  The decision to terminate Plaintiff was made within days of learning about the allegations against her.  *See* SOMF 36.

Plaintiff's termination was justified and would have occurred even if she had not been an alleged whistleblower.  Plaintiff has not provided any evidence to contrary.  Under these circumstances, no reasonable jury could find for Plaintiff on her WPA claim.  The Court should grant this motion and award summary judgment to the District on Count III of the Complaint.

18

### III.   PLAINTIFF HAS NO CLAIM FOR WRONGFUL DISCHARGE BECAUSE IT IS DUPLICATIVE OF HER WPA CLAIM.

Even after full discovery, Plaintiff cannot show the requisite facts to prevail on the merits of her wrongful termination claim.  "In some circumstances, [courts in the District of Columbia] have recognized a common law tort of wrongful discharge 'as an exception to the traditional at-will doctrine governing termination of employment, where the discharge violates a clear mandate of public policy.'" *Carter v. Dist. of Columbia,* 980 A.2d 1217, 1225 (D.C. 2009) (quoting *Dist. of Columbia v. Beretta, U.S.A., Corp.,* 872 A.2d 633, 645 (D.C. 2005) (internal quotation omitted)).  However, the D.C. Court of Appeals has declined to find such an exception where the Whistleblower Protection Act provides redress for an allegedly wrongful termination.  *Id.*

> This is not a case where we have any need to create a new exception to the at-will employment doctrine in order to vindicate an important public policy. The Council squarely addressed the issue itself, articulating an express public policy in favor of government employee whistleblowing and creating a specific, statutory cause of action to enforce it. In this situation, our cases require us to defer to the legislature's prerogatives and to decline to recognize a novel, competing cause of action for wrongful discharge at common law.

 *Carter,* 9080 A.2d at 1226; *see also McManus v. MCI Commc'ns Corp.*, 748 A.2d 949, 957 (D.C. 2000) (wrongful discharge claim inapplicable where D.C. Human Rights Act provides remedy for plaintiff's claim of discrimination); *Freas v. Archer Servs., Inc.*, 716 A.2d 998, 1002 (D.C. 1998) (same)); *and Kakeh v. United Planning Organization*, 537 F.Supp.2d 65, 72-73 (D.D.C. 2008) (holding "the District's *own* common law extinguishes [a Wrongful Termination claim] when the statute giving rise to the public policy at issue contains an alternative remedy") (emphasis in original, internal citation omitted).

This directive applies with equal force here.  The gravamen of plaintiff's wrongful termination claim is that she was terminated because she "refused to modify the CBE guidelines for the DCAS policy and overlook the discrepancies in contracts pending before the DCHF."

19

Compl. ¶ 97.  The WPA provides a specific statutory remedy for this purported misconduct.  In addition to prohibiting retaliation against an employee who makes a "protected disclosure," the WPA also protects District employees who refuse to follow an illegal order.  *See* D.C. Code § 1-615.53.  Because plaintiff's wrongful termination claim is predicated on purported misconduct that can be addressed by the D.C. Whistleblower Protection Act, it should be dismissed.[3]

## CONCLUSION

Applicable decisional law and the undisputed facts in the record prove that the District is entitled to summary judgment on all of Plaintiff's remaining claims.  Plaintiff's constitutional defamation claim cannot survive because the statements made about her by the District are not defamatory and it is undisputed that Plaintiff has worked in the field of health care administration since her termination.  Plaintiff's whistleblower claim cannot withstand the District's unassailable legitimate, independent reason for her termination.  Finally, Plaintiff cannot prevail on her claim for wrongful discharge because any alleged misconduct may be remedied pursuant to statute.   For all these reasons, the District is entitled to summary judgment.

SEPTEMBER 2, 2014                    Respectfully submitted,

                                     IRVIN B. NATHAN
                                     Attorney General for the District of Columbia

                                     GEORGE C. VALENTINE
                                     Deputy Attorney General, Civil Litigation Division

                                     /s/ *Jonathan H. Pittman*
                                     JONATHAN H. PITTMAN    [D.C. Bar No. 430388]
                                     Chief, Civil Litigation Division Section III

                                     /s/ *Sarah L. Knapp*
                                     SARAH L. KNAPP [470008]

---

[3] The fact that plaintiff cannot prevail on her WPA claim does not change this analysis.  *See Carter*, 980 A.2d at 1225.

Assistant Attorney General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001
(202) 724-6528
Email:  sarah.knapp@dc.gov

*/s/ Brant W. Martin*
BRANT MARTIN [1010510]
Assistant Attorney General
441 Fourth Street, NW, Suite 630 South
Washington, DC 20001
(202) 442-9840
Email: brant.martin@dc.gov

*Counsel for Defendant*