UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JENNIFER B. CAMPBELL, DR. PH. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:12-cv-01769-RC |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Summary Judgment should be denied on Plaintiff's Constitutional Defamation claim because it is undisputed that during the course of terminating Dr. Campbell's employment as Chief Operating Officer for the District of Columbia Department of Health Care Finance (DHCF), the District, through the Mayor's office and Wayne Turnage, Director of DHCF, leaked internal emails to the media, the overall implication of which was that it had concluded that Dr. Campbell had engaged in unlawful contract steering, with respect to the District of Columbia's 70 million dollar Health Insurance Exchange Contract (HIX).

Based on the record, a reasonable juror could conclude that the allegations that Dr. Campbell tried to steer CGI Technologies and Solutions, Inc. (CGI) to partner with Darryl Wiggins and Compass Solutions, LLC to partner with Cedric Simon are false because:

- Dr. Campbell, Mr. Simon, and Mr. Wiggins all deny the allegations;

- Testimony from District Contracting Staff members whom Mr. Turnage allegedly interviewed during his investigation confirms that Dr. Campbell did not act inappropriately;

- Conflicting testimony exists regarding the source of the allegations.  Mr. Onyewuchi, CEO of Compass, testified that Holli Ploog, Vice President of CGI, informed him that CGI would no longer partner with Compass on Phase II of the HIX pursuant to instructions from Dr. Campbell that CGI partner with Mr. Wiggin's company.  Ms. Ploog, however, denies this.

- In *Campbell v. CGI Technologies and Solutions, Inc*., et al, 2012 CA 008217 B (D.C. Sup. Aug 14 2014), the court found that Dr. Campbell had established she was likely to succeed on her defamation claims against CGI and Compass based on the same allegations as the present matter.

In addition, factual issues remain regarding whether the District acted in bad faith in an effort to injure a political competitor.  Dr. Campbell alleges that the District, along with CGI and Compass, concocted a series of false allegations that she acted unethically and tried to steer Compass to partner with Mr. Simon and CGI to partner with Mr. Wiggins, an influential advisor to Councilmember Muriel Bowser, to further their respective motives.  Evidence suggests that Mayor Vincent Gray's office intentionally leaked the false contract steering allegations to the press in an effort to injure Councilmember Muriel Bowser, a political opponent of Mayor Gray in the 2014 Mayoral race.

Summary judgment should also be denied on Plaintiff's claim under the D.C. Whistleblower Protection Act because factual issues exist as to whether Dr. Campbell was terminated over the false contract steering allegations in retaliation for her objections to Mr. Turnage's favoritism toward CGI and his "open door" policy which she perceived as preferential to CGI.

Summary judgment should also be denied on Plaintiff's wrongful termination claim because a reasonable juror could conclude that Dr. Campbell was terminated because she refused to violate District contracting laws to favor CGI.

## STATEMENT OF FACTS

Dr. Campbell was formerly employed by the District from 2008 until her employment was terminated effective June 26, 2012 over false allegations she engaged in contract steering. Declaration of Jennifer Campbell (Campbell Decl) ¶ 4, attached hereto as Exhibit 1; Ex. 2.  During the relevant time, Dr. Campbell worked as the Director of Health Care Reform and Innovation Administration for DHCF until May 7, 2012, when she was promoted to COO of DHCF, reporting directly to Wayne Turnage, Director of DHCF.  Campbell Decl. ¶ 2.  In her roles, Dr. Campbell was involved with planning, establishing, and implementing the District's new healthcare exchange.  *Id* at 3.  Dr. Campbell also oversaw the contract bidding process, reviewed, and signed off on contracts, including Compass Solutions, LLC and CGI Technologies and Solutions, Inc. bids on the HIX contracts.  *Id* at 2,17.

### HIX Phase I

In April of 2012, DHCF awarded Compass Phase I of the HIX. Campbell Decl. ¶ 9. Compass was considering partnering with Carrie Brooks Brown Consulting Services (CBBS) and Cedric Simon, a consultant for CBBS, on the contract.  Testimony of Anthony Onyewuchi (Onyewuchi Dep), attached as Exhibit 3, at 8:13-12:6.  According to Anthony Onyewuchi, CEO of Compass, during discussions with CBBS and Mr. Simon regarding a partnership, Carrie Brooks-Brown and Mr. Simon told him that "the client wants him [Mr. Simon] to be the *project manager."*  Onyewuchi Dep at 13:5-12, though neither ever stated who they were referring to as the "client."  Onyewuchi Dep at 14:1-20:19.  At no time did Dr. Campbell tell Compass to hire Mr. Simon, nor did she have any discussions with Mr. Simon or Ms. Carrie Brooks-Brown,

owner of CBBS, indicating that Mr. Simon was required to work on the project.  Campbell Decl.
¶ 12-13.

After Compass was awarded the contract, Dr. Campbell consulted Compass's organizational
chart which it had submitted with its final proposal, determined its client liaison, and asked him to
organize a contract kickoff meeting.  *Id.*  ¶ 10.  The client liaison was Cedric Simon.  On April 10,
2012, a contract kickoff meeting was held to review standard District procedures.  *Id.* ¶ 11.  Mr.
Onyewuchi, Ms. Brooks- Brown, Mr. Simon, and Tracy Prigmore, and others attended on behalf of
Compass; Dr. Campbell, Bonnie Norton, Project Manager, and Sam Walker, a contractor, among
others attended on behalf of the District.  Onyewuchi Dep at 23:10-24:22; Testimony of Sam
Walker (Walker Dep), attached as Exhibit 4, at 7:3-14; Testimony of Bonnie Norton (Norton Dep),
attached as Ex. 5, at 14:11-14.

During the kickoff meeting, Dr. Campbell "informed Compass that any substantive changes
to the final proposal, including staffing deliverables, and deliverable dates would need to be
approved in writing through Bonnie Norton, their point of contact at DCHF."  Campbell Decl. ¶ 11.
*See* Ex. 6 ("Any proposed changes must be approved by the contract administrator").  This was
standard procedure within the DHCF.  *Id.*  This practice was adopted because "in the past
contractors often switched their teams after the contract was awarded to them, replacing seasoned
workers with less experienced ones, and delivering an inferior product."  *Id.*

According to Mr. Onyewuchi, during the kickoff meeting, Dr. Campbell opened
Compass' proposal to Compass' organization chart, a document submitted by Compass with its
proposal in which Compass listed Mr. Simon as *client liaison,* and said nothing on here or no one
on here should change.  Onyewuchi Dep at 22:9-11; 23:10-27:6.  Despite previously believing
that Dr. Campbell wanted Mr. Simon to be *project manager,* Mr. Onyewuchi inferred through

Dr. Campbell's alleged actions during the meeting that she now required Mr. Simon to be *client liaison*.  Onyewuchi Dep at 25:16-19; 44:12-22.

Dr. Campbell denies that she held up the organizational chart, or pointed to Mr. Simon's name.  Campbell Decl ¶ 12.  Mr. Simon, who also attended the meeting, also swears this never happened.  Affidavit of Cedric Simon ("Simon Aff.")  ¶ 8, attached hereto as Exhibit 7.  Mr. Simon recalls Dr. Campbell informed the group that, together with the letter of agreement, the proposal was essentially the contract and there could be no deviations without approval from DHCF."  *Id.*

Bonnie Norton, Project Manager, who also attended the kickoff meeting, confirms that Dr. Campbell said something to the effect of "if you are to change any staffing from what is on – what was on your proposal, you would have to let us know and we would have to approve it." Ms. Norton did not find this unusual because, depending on the contract, it is standard practice to require approval of changes to proposed staff.  Norton Dep. at 11:7-15; 15:19-16:22.  Ms. Norton did not believe Dr. Campbell acted inappropriately during the meeting.  Norton Dep at 21-8:21:22.

Sam Walker, a contractor for the District who attended the meeting, does not recall Dr. Campbell holding up Compass' organizational chart or stating that nothing or nobody on it should change, and did not believe that Dr. Campbell acted inappropriately during the meeting. Walker Dep. at 7:3-8:14.

### HIX Phase II

Around this time, CGI arranged several presentations with DHCF through Mr. Turnage to campaign for phase II of the HIX contract.   Campbell Decl. ¶ 8.  CGI was in talks with Compass to partner on Phase II of the HIX contract.  *Id .*; Onyewuchi Dep. at 36:8-38:4.  In August 2011, CGI arranged two presentations for the DHCF, through Mr. Turnage, to campaign for phase II of the

HIX contract.  Campbell Decl. ¶ 8.  The first was in August or September 2011, the second on May 15, 2012.  Campbell Decl ¶ 40.

On numerous occasions, Dr. Campbell raised concerns to Mr. Turnage regarding what she perceived as his favoritism toward CGI.  Between approximately September 2011 and April 2012, Dr. Campbell reported to Mr. Turnage that she felt the meetings/demonstrations he was having with CGI pursuant to his "open door policy" could show favoritism toward CGI because other contractors were not provided the opportunity to do similar presentations.  Campbell Decl. ¶ 37-43.

On May 15, 2012, at one of CGI's presentations, Dr. Campbell reminded CGI of the District's mandated use of certified business enterprises (CBEs) and that given the magnitude of the contract, the requirement couldn't be waived.  Campbell Decl. ¶ 19.   A few days after the meeting, Dr. Campbell received a call from Holli Ploog, Vice President of CGI, asking for information on potential CBE partners.  Ms. Ploog alleges that during the call Dr. Campbell informed her that CGI should look at partnering with Darryl Wiggins' company, Document Managers dba Digidocs instead of Compass.  Ploog Affidavit, attached as Exhibit 8, at ¶ 8.

Dr. Campbell denies this.  During the call, Dr. Campbell stated she could only share which CBE's had performed work for DHCF in the past and could not speak to their performance.  Campbell Decl. ¶ 20.  Dr. Campbell then referred her to the Department of Small and Local Business Development for additional  information.  *Id.*  Dr. Campbell never suggested to Ms. Ploog that CGI should partner with any company, including Document Managers or Darryl Wiggins. Campbell Decl ¶ 28.  Mr. Wiggins also swears that he never had any discussions with Dr. Campbell regarding a potential partnership between Digidocs and CGI.  Wiggins Affidavit, attached as Exhibit 9, ¶ 5.

**HIT Contract**

During this time, CGI was also negotiating with DHCF to secure another contract, the Health Information Technology contract ("HIT").  Campbell Decl. ¶ 14.  Dr. Campbell, whose job encompassed contract review, *id.* ¶ 3, noticed several contractual irregularities in the HIT contract, including the lack of a liquidated damages clause and inconsistencies with CGI's best and final offer (BAFO) and the contract.  *Id.* ¶ 15.  In May 2012, Mr. Turnage asked Dr. Campbell to sign off on CGI's HIT contract, despite contractual irregularities and he and his assistant followed up with her daily regarding the status of the contract.  *Id.* ¶ 17.

On May 10, 2012, Dr. Campbell, informed her staff that she was not ready to award the HIT contract to CGI, due to  the contractual irregularities, and during the last week of May 2012, informed Mr. Turnage that she would not sign off on CGI's contract. *Id.* ¶ 15; Testimony of Wayne Turnage (Turnage Dep), attached as Exhibit 10, at 68:5-69:11.  The Office of Contracts and Procurement (OCP) then discussed these issues with CGI, who resisted the changes.  *See* Ex. 11.

As a result of Dr. Campbell's refusal to sign off on CGI's preferred version of the contract, CGI declined to purse the HIT contract.  Norton Dep at 13:20-17:22; Ex. 12 ("CGI got in a dispute with JC over contract language for this project.  They quietly believed she was stalling the contract until they would agree to take on Wiggins' firm as partner on the Exchange- I don't believe that"); Ex. 13 ("the general counsel at CGI is furious with their VP for 'not closing the book' and walking away when JC started pushing.").

CGI's campaign to win the larger HBX contract continued, however, and CGI now viewed Dr. Campbell as an impediment to its award of Phase II of the HIX contract.  CGI and Compass then decided, together with Mr. Turnage, that Dr. Campbell had to go and  they concocted a series of falsehoods to make her look like she had acted unethically by steering CGI and Compass toward

certain partnerships.  For Compass, this partnership was Cedric Simon.  CGI, through its Vice

President, Holli Ploog, claimed Dr. Campbell had tried to steer them toward a man named Darryl

Wiggins, whom Dr. Campbell had only met once in Turnage's presence.  Campbell Decl. ¶ 29.

### False Allegations

On June 1, 2012, a Saturday morning, Mr. Onyewuchi contacted Mr. Turnage and informed

him that he believed Dr. Campbell had engaged in inappropriate behavior, and arranged a meeting

the next morning.  Onyewuchi Dep. at 40-42:11.  On Sunday June 2, 2012, Mr. Onyewuchi met

with Mr. Turnage and reported a litany of false allegations, including the following:

- Dr. Campbell had requested that Cedric Simon be on Compass' contract for Phase I of
  the HIX contract by holding up Compass' organization chart at the contract kickoff
  meeting and saying nothing on this page should change;

- Mr. Onyewuchi had heard from Holli Ploog, Vice President of Business Development at
  CGI that Dr. Campbell had asked CGI not to partner with Compass on Phase II of the
  HIX contract and instead was requiring CGI to partner with Daryl Wiggins' company,
  Document Managers, dba Digidocs;

- According to CGI, Dr. Campbell was meeting with minority vendors in an effort to put
  together a team to submit a bid as the prime for the HIX.

Onyewuchi Dep at 40:8-48:6; Ex. 2.

Mr. Onyewuchi later provided Mr. Turnage with a chronology of events, attached as

Exhibit14; Turnage Dep. at 11:12-13:22.   Mr. Turnage used Mr. Onyewuchi's chronology to create

his own chronology, attached as Exhibit 15.  Turnage Dep at 11:12-13:22.  After speaking with Mr.

Onyewuchi, Mr. Turnage contacted Ms. Ploog on June 2, 2012, who informed him that during a

phone call, Dr. Campbell had tried to steer CGI to partner with Mr. Wiggins' company, Document

Managers or Digidocs on phase II of the HIX instead of Compass.  Turnage Dep. at 17-20.

According to Ms. Ploog, Dr. Campbell had called her on May 21, 2012 and informed her that  "(1)

she and Wayne Turnage had spoken and believed that CGI needed advice and guidance on selecting

CBE partners for the HIX contract; (2) Document Managers had previously done good work in its

projects with the District of Columbia; and (3) CGI would not be able to partner with Compass

because a conflict of interest precluded Compass from competing for the HIX contract and, in any

event, Compass had too much business in the District of Columbia already as one of only a few

CBEs that held a GSA schedule contract."  Ex. 8, Ploog Aff'd, ¶ 8.

    According to Mr. Onyewuchi, sometime around the end of April or May 2012, Ms. Ploog,

informed him that CGI would no longer partner with Compass on Phase II pursuant to instructions

from Dr. Campbell that they partner with Mr. Wiggins' company, Document Managers.

Onyewuchi Dep at 36:8-38:4.  Ms. Ploog, however, denies that she ever had any conversations

with anyone from Compass regarding Dr. Campbell or that she told Mr. Onyewuchi that CGI

would not partner Compass because Dr. Campbell required them to partner with Document

Managers.  Testimony of Holli Ploog (Ploog Dep), attached as Exhibit 16 at 45.  Ms. Ploog also

never told Mr. Onyewuchi that Dr. Campbell was meeting with minority vendors to put together

a team to bid on the health insurance contract.  Ex. 16, Ploog Dep at 46:5-13.  Dr. Campbell

denies that she had been meeting with minority vendors in an effort to create a team to bid on the

HIX contract. Campbell Aff. ¶ 33-35.

### The District's Cursory Investigation

    After learning of the allegations against Dr. Campbell over the weekend of June 2-3,

2012, Mr. Turnage engaged in a cursory investigation that was concluded by the following

Monday June 4, 2012 at which time he placed Dr. Campbell on administrative leave.  *See* Ex. 17;

18. Mr. Turnage never interviewed Dr. Campbell regarding the allegations made against her. Campbell Decl ¶18-23.

According to Mr. Turnage, District contracting staff Bonnie Norton and Sam Walker confirmed the contract steering allegations.  Turnage Dep at 8-9, 22,  However, there are no notes regarding Mr. Turnage's alleged investigation and, more importantly, testimony by Ms. Norton and Mr. Walker is at odds with Mr. Turnage's claim that they substantiated the allegations against Dr. Campbell.  Turnage Dep at 22:2-3.

According to Mr. Turnage, Mr. Walker voluntarily approached him and reported that he had heard from members of the selection committee (responsible for awarding Compass the Phase I HIX contract) that Dr. Campbell was acting in ways that seemed to favor Compass and there were questions about the way she handled the kickoff meeting with Compass.  Turnage Dep at 30:17-33:12.  Mr. Walker, however, denies that he ever had any conversation with Mr. Turnage regarding Dr. Campbell.  Walker Dep at 9:1-3.  Mr. Walker also never had any discussions with members of the selection committee regarding Dr. Campbell, no one ever approached him with concerns regarding Dr. Campbell, and no one ever raised concerns to him about the way Dr. Campbell handled the kickoff meeting.  Walker Dep at 9:4-10:18.

Similarly, according to Mr. Turnage, he then met with Bonnie Norton (a member of the selection committee who also attended Compass' kickoff meeting) who confirmed that Dr. Campbell rated Compass more favorably whereas all of the other members rated another company higher.  Turnage Dep at 33:17-35:16.  According to Mr. Turnage, Ms. Norton also confirmed that Dr. Campbell held up Compass' organizational chart during the kickoff meeting.  *Id.*  Ms. Norton, however, testified that she told Mr. Turnage that Compass was selected per OCP guidelines and she didn't really discuss anything else about the selection panel with Mr. Turnage.  Norton Dep at 9:11-

16.  She also did not believe Dr. Campbell acted inappropriately during the kickoff meeting and never informed Mr. Turnage that she believed Dr. Campbell behaved inappropriately during the kickoff meeting.  Norton Dep at 21: 8-15.

Within a little over a week, on June 11, 2012, Mr. Turnage terminated Dr. Campbell's employment effective June 26, 2012.  See Ex. 2.

### The District Intentionally Leaked Dr. Campbell's Termination and the False Reasons for her Termination to the Media

On June 7, 2012, Alan Suderman, a reporter from the Washington City Paper emailed Pedro Ribiero, Director of Communications in the Executive Office of the Mayor, asking generally about Dr. Jennifer Campbell.  Ex. 20.  Mr. Suderman also contacted Mr. Ribiero by phone and again asked him generally what was going on with Jennifer Campbell, did not explain what he meant, and asked that Mr. Ribiero provide him with information.  Testimony of Pedro Ribiero (Ribiero Dep), attached as Exhibit 21, at 6:2-7:5; 13:11-14:13.  In response, Chris Murphy, the Mayor's Chief of Staff provided Mr. Ribiero with internal emails Mr. Turnage had sent to individuals in the Mayor's office relating to the allegations against Dr. Campbell, which Mr. Ribeiro then allowed Mr. Suderman to review and take notes on, but did not provide him with copies of the emails.  Ribiero Dep. at 6:22-9:4.  Neither Mr. Ribiero nor Mr. Murphy knew whether Mr. Suderman was aware of the allegations against Dr. Campbell when Mr. Suderman initially contacted Mr. Ribiero.  Testimony of Chris Murphy (Murphy Dep), attached as Exhibit 22, at 7:19-22; Ribiero Dep. at 6:14-18.

On June 10, 2012, Mr. Suderman contacted Mr. Turnage and informed him that he had internal emails that Mr. Turnage had sent to individuals in the Mayor's office regarding Dr. Campbell, read excerpts of the emails to him, and threatened to use them if Mr. Turnage did not comment.  Turnage Dep at 42:20- 46:4.  Immediately after their conversation, Mr. Turnage

emailed Mr. Suderman copies of the internal emails, with various updates and corrections regarding actions the District was taking relating to the allegations against Dr. Campbell.  Ex. 23; Turnage Dep. at 50:7-58:10.

On June 11, 2012, Mr. Suderman published an article in the Washington City Paper titled, Health Care Finance COO Fired Over Contract Steering Allegations.  Ex. 23. The Washington City Paper article states that according to Mr. Turnage's emails:

- "Campbell was trying to force CGI to partner with Darryl Wiggins";

- "Campbell was trying to steer another contract, Compass Consulting, toward a different potential partner, Cedrick Simon; and

- Campbell tried to "steer business towards some minority firms and away from others."

Ex. 23.

After Mr. Suderman published his article, Tim Craig, a reporter from the Washington Post, contacted Mr. Turnage.  Upon consultation with Mr. Ribiero, Mr. Turnage and Melissa Byrd, Chief of Staff, Department of Health Care Finance, Mr. Turnage agreed to meet with Mr. Craig and provided him an opportunity to review and take notes on the emails regarding Dr. Campbell.  Turnage Dep at 59-61:16.  On June 12, 2012, Mr. Craig published an article in the Washington Post, titled "D.C. Official is fired over contract allegations."  Ex. 25.  The Washington Post Article states that according to Mr. Turnage's emails, Dr. Campbell was accused of:

- Attempting to "steer part of a pending contract to create a health-care exchange to Darryl Wiggins"; and

- "meeting with minority vendors in an effort to put together a team that would submit a bid as a prime for the insurance exchange network."

Ex. 25.

Evidence suggests that Mayor Vincent Gray's office intentionally leaked the false contract steering allegations (that Dr. Campbell was pressuring CGI to partner with Darryl Wiggins, an influential advisor to Councilmember Bowser) to the press in an effort to injure Councilmember Muriel Bowser, a political opponent of Mayor Gray in the 2014 Mayoral race. After learning that Mr. Suderman had knowledge of his internal emails, on June 10, 2012, Mr. Turnage emailed individuals in the Mayor's office asking who leaked the emails. Ex. 26. In response, someone from the Mayor's office called Mr. Turnage and informed him that he should talk to Mr. Murphy if he wanted to find out who had leaked the emails. Turnage Dep at. 46:7-48:1. Mr. Turnage then met with Mr. Murphy in Murphy's office for approximately 15 to 20 minutes to discuss the leaked emails, during which time Mr. Murphy apologized to Mr. Turnage and said he hoped Mr. Turnage understood. Turnage Dep. at 48:2-50:2. According to Turnage, despite his conversation with Mr. Murphy, he does not know how Mr. Suderman obtained his emails, and during the meeting he did not even ask Mr. Murphy who leaked the emails. Turnage Dep at 42:20-46:4; 48:20-49.

Around this time, in a series of email exchanges with Janene Jackson, Director, Office of Policy and Legislative Affairs, Mr. Turnage wrote "My viscera tells me this was a Wilson Building Special" and subsequently that he had "Verified this morning. Said they were approached about the story." Ex. 27. In response, Ms. Johnson writes, "That's all I needed ot know. It was leaked to get at a CM who isn't Catania." *Id.*

**The District's Actions have Impugned Plaintiff's professional reputation and Foreclosed
her Ability to Obtain Employment in her Field**

Between the date of her termination from DHCF on June 26, 2012 and July 2014, Dr.

Campbell applied for over 30 positions, but did not receive a fulltime job offer.  Campbell Decl.

at ¶ 45.  In July 2012, Dr. Campbell applied for a position as Director Healthcare Management

Consulting with Planned Parenthood, went through numerous rounds of interviews, and was a

top candidate.  Ex. 28; Campbell Decl at ¶ 47-49.  After Planned Parenthood received a copy of

the Washington Post article, however, it informed her it needed to check with its general counsel,

they were concerned because there was an active IG investigation, she was a potential liability,

and ultimately declined to hire her.  Campbell Decl ¶50-52; Ex. 29.

As a result of the District's public dissemination of the false allegations against her,

between June 6, 2014 and July 2014, the only work Dr. Campbell could obtain was on two

temporary contracts through her consulting company, J. Blakely Campbell & Associates, and

work as an Adjunct Assistant Professor for a Public Health Administration course at the

Maryland University College (UMUC) for one semester from February 4, 2013 through April

29, 2013.  Campbell Decl ¶53-54.

The temporary work that she performed through her consulting company included one

contract with Health Dimension Group, an intermediate care facility under which she developed

a business/needs assessment plan for their expansion into another market and a contract with the

Wright Group under which she traveled to various sites to conduct public health training on the

intersection between HIV and domestic violence/ violence against women.  Ex. 30; Ex. 31.

In July 2014, about two years after her termination from DHCF, Dr. Campbell finally

obtained fulltime employment as a Senior Consultant with Cognosante, an operations

consulting/quality assurance role, at an annual salary of $10,000 less than she earned at DHCF.

Campbell Decl ¶ 56.  Her job duties include serving as the Affordable Care Act Senior Subject Matter Expert and Quality Assurance (QA) Manager assigned to the Centers for Medicare & Medicaid Services (CMS) Enrollment Assistance Project.  *Id.* at ¶ 57.  She is responsible for the development, planning, and implementation of statewide QA activities and QA deliverables.  *Id.* In the two years since she was fired by DHCF, Dr. Campbell earned $20, 689, $279,311 less than she would have earned had she not been fired.  *Id.* at ¶ 53.

## LEGAL ARGUMENT

### I.  PLAINTIFF CAN ESTABLISH  A CLAIM OF CONSTITUTIONAL DEFAMATION

To establish a Fifth Amendment deprivation of liberty interest claim, a Plaintiff may proceed under one of two theories; a reputation-plus or a stigma or disability theory.

#### 1.  Reputation Plus

Under a reputation plus theory, a Plaintiff must allege "defamation that is 'accompanied by a discharge from government employment or at least a demotion in rank and pay.'"  *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998) (quoting *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983)) (emphasis omitted).  To implicate a liberty interest, the defamatory statements accompanying a termination must "call into serious question those personal characteristics that are central or enduring in nature, such as dishonesty, commission of a felony, manifest racism, serious mental illness, or lack of intellectual ability."  *Alexis v. District of Columbia*, 44 F. Supp. 2d 331, 339 (D.D.C. 1999).  Further, the government must have "publicly disclosed the defamatory information."  *Dave v. D.C. Metro. Police Dep't*, 926 F. Supp. 2d 247, 250 (D.D.C. 2013); *See also Burton v. Town of Littleton*, 426 F.3d 9, 16 (1st Cir. 2005) (Public disclosure of defamatory charges to the press implicates a liberty interest); *Evangelou v. D.C.*, 2014 U.S. Dist. LEXIS 110410 (D.D.C. Aug. 11, 2014); *McCormick v. D.C.*,

899 F. Supp. 2d 59, 2012 U.S. Dist. LEXIS 151512 at *5 (D.D.C.); *De Sousa v. Dep't of State*, 840 F. Supp. 2d 92, 110 (D.D.C. 2012).

Here, it is undisputed that Dr. Campbell was discharged from government employment on June 26, 2012 over allegations of misconduct, contract steering, and violating the District's ethical standards.  *See* Ex. 2.  Such allegations are sufficient to implicate a liberty interest.  *See e.g. Alexis v. District of Columbia*, 1999 U.S. Dist. LEXIS 13482, 17-18 (D.D.C. June 15, 1999) ("Employers' negative statements about terminated employees have generally been found to assume constitutional dimensions when they describe the employees as personally dishonest, immoral, criminal, mentally ill or lacking integrity");  *Doe v. United States Department of Justice*, 753 F.2d 1092, 1112-13, n.24 (D.C. Cir. 1985) (allegations of unprofessional conduct and dishonesty sufficient to constitute a deprivation of liberty interest).

### A. During the Course of Terminating her Employment, The District Publicly Disclosed the Fact that Plaintiff's Employment was Terminated for Alleged Misconduct and Unethical Behavior

The District publicly disseminated allegations that Dr. Campbell was terminated for alleged misconduct, contract steering, and violating the District's ethical standards.  Internal emails indicate that the allegations, which include that Dr. Campbell was trying to force CGI to partner with Darryl Wiggins, were leaked by the District to embarrass Councilmember Muriel Bowser, a political rival of Mayor Vincent Gray.  Darryl Wiggins is an influential advisor to Muriel Bowser.  See Ex. 24 (discussing Mr. Wiggin's role on Bowser's campaigns); Ex. 27 ("It was leaked to get at a CM who isn't Catania.").

The District's disclosure of the allegations against Dr. Campbell and the reasons for her termination was likely a violation of the District's Records Management and Privacy of Records regulations that prohibit unauthorized disclosure of employee personnel records. *See e.g.* D.C.

Mun. Reg 6-B3100 ("All official personnel records of the District Government shall be established, maintained, and disposed of in a manner designed to ensure the greatest degree of applicant or employee privacy while providing adequate, necessary, and complete information for the District to carry out its responsibilities under the District of Columbia Government Comprehensive Merit Personnel Act of 1978"); DCMR 6-3106.2 ("agency employees whose official duties involve personnel records shall be sensitive to individual rights to personal privacy and shall not disclose information from any personnel record unless disclosure is part of their official duties or required by regulation or statute (e.g., required by the D.C. Freedom of Information Act).

Pedro Ribiero, Director of Communications in the Executive Office of the Mayor, upon consultation with Chris Murphy, the Mayor's Chief of Staff, allowed Mr. Suderman, a reporter from the Washington City Paper, to review and take notes on internal emails Mr. Turnage had sent to the Mayor's staff regarding Dr. Campbell and the allegations against her, including "her relationship with one of the companies that was a contractor for DHCF."   Ribeiro Dep. at 6:22-9:4;7:5-12:13; Murphy Dep. at 8:18-20; Ex. 20.

Though Mr. Suderman contacted Mr. Ribiero generally regarding Dr. Campbell, he offered no indication that he was aware of the specifics regarding Dr. Campbell's circumstances and neither Mr. Murphy nor Mr. Ribiero knew whether Mr. Suderman was in fact aware of the particular allegations against Dr. Campbell when they agreed to allow him to review and take notes on Mr. Turnage's emails.  Murphy Dep. at 7:19-22 (Q:  When Mr. Suderman contacted Mr. Ribeiro, was he already aware of the allegation about Ms. Campbell?  A. I don't know."); Ribiero Dep. at 6 (A:  He asked me if I knew who Jennifer Campbell was and what was going on

with her, and I told him no. Q:"Did Mr. Suderman explain what he meant by what was going on with Ms. Campbell?  A:  No, he was—he did not explain.").

After reviewing Mr. Turnage's emails, Mr. Suderman called Mr. Turnage directly; Mr. Turnage then emailed him copies of his emails with various updates and corrections regarding actions the District was taking relating to the allegations against Dr. Campbell.  Ex.  23; Turnage Dep. at 50:7-58:10.  These emails included Mr. Turnage's summary of the allegations against Dr. Campbell, actions he intended to take to investigate, that Dr. Campbell had been placed on administrative leave, and that the District intended to terminate her employment for cause as a result of the allegations.  *See* Ex. 23.

Mr. Suderman than used this information in an article titled "Health Care Finance COO Fired Over Contract Steering Allegations" published in the Washington City Paper on June 11, 2012.  Ex. 24.  It is clear that article utilized the information Mr. Suderman received from the District.  The article specifically references Mr. Turnage's emails to the Mayor's office and quotes one of Mr. Turnage's emails stating that they had reason to believe Dr. Campbell had tried to "steer business towards some minority firms and away from others."  *See* Ex. 23; Ex. 24. The article also identifies the specific allegations made by CGI and Compass:  that Dr. Campbell was trying to force CGI to partner with Darryl Wiggins and that Dr. Campbell was trying to steer Compass to partner with Cedric Simon on the District's health insurance exchange contracts. *See* Ex. 24.

After Mr. Suderman published his article, Tim Craig, a reporter from the Washington Post, contacted Mr. Turnage, and Turnage agreed to meet with Mr. Craig and provided him an opportunity to review and take notes on his emails to the Mayor's staff regarding Dr. Campbell.

Turnage Dep at 59-61:16.  Mr. Turnage also confirmed to Mr. Craig that Dr. Campbell's

employment had been terminated.  Turnage Dep. at 61:10-11; Ex. 25.

On June 12, 2012, Mr. Craig published an article in the Washington Post, titled "D.C.

Official is fired over contract allegations."  Ex. 25.  Mr. Craig's article outlines CGI's allegations

against Dr. Campbell, again quoting from Mr. Turnage's emails.

As set forth below, the allegations against Dr. Campbell are false and the District's public

dissemination of the reasons for her removal stigmatized her professional reputation and

foreclosed her future employment opportunities.

### B.  The District Defamed Dr. Campbell

To state a claim for defamation, a Plaintiff must allege (1) that the defendant made a false

and defamatory statement concerning the plaintiff; (2) that the defendant published the statement

without privilege to a third party; (3) that the defendant's fault in publishing the statement

amounted to at least negligence; and (4) either that the statement was actionable as a matter of

law irrespective of special harm or that its publication caused the plaintiff special harm.  *Rosen v.*

*Am. Isr. Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1255 (D.C. 2012) citing *Oparaugo v. Watts*,

884 A.2d 63, 76 (D.C. 2005).

The "threshold task in an action for defamation is to determine whether the challenged

statement is "capable of bearing a particular meaning," and "whether that meaning is

defamatory."  *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000) citing

Restatement (Second) of Torts § 614 (1) (1977).  A publication is considered defamatory "if it

tends to injure plaintiff in his trade, profession or community standing, or lower him in the

estimation of the community."  *McBride v. Merrell Dow & Pharmaceuticals, Inc.*, 540 F. Supp.

1252, 1254 (D.D.C. 1982) citing *Olinger v. American Savings & Loan Association*, 409 F.2d

142, 144 (D.C.Cir.1969).  In the District of Columbia, a court has limited power to determine

that, as a matter of law, a statement is not defamatory.  *See White v. Fraternal Order of Police*,

909 F.2d 512, 518 (D.C. Cir. 1990) ("It is only when the court can say that the publication is not

reasonably capable of any defamatory meaning and cannot be reasonably understood in

any defamatory sense that it can rule as a matter of law, that it was not libelous.").

Whereas statements of fact can be actionable, statements of opinion are not actionable

unless they imply or rely upon objectively verifiable facts that can be proven false.  *See e.g.*

*Rosen v. Am. Isr. Pub. Affairs Comm.*, *Inc.,* 41 A.3d 1250, 1256 (D.C. 2012).  In contrast, "if it is

plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or

surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is

not actionable."  *Guilford Transp. Indus.*, 760 A.2d at 597 citing *Haynes v. Alfred A. Knopf, Inc.*,

8 F.3d 1222, 1227 (7th Cir. 1993).

1.  **Turnage's statements in his emails constitute statements of fact reasonably
     capable of a defamatory meaning**

Mr. Turnage's emails, provided by the District to both Mr. Suderman and Mr. Craig,

summarize the specific allegations against Dr. Campbell, that she "directed these companies

[Compass and CGI] to hire or partner with certain individuals or firms and took retaliatory action

if push back occurred," and imply that based on his cursory investigation, Mr. Turnage had

confirmed the allegations: "We had reason to believe that Jennifer had directed certain

contractors to steer business towards some minority firms and away from others"; "This

concludes my investigation of this issue and I will inform Director Stokes that I am firing

Jennifer Campbell."  Ex. 23.

Similarly, the articles published by Mr. Suderman and Mr. Craig reference and quote

Turnage's emails setting forth the specific allegations made by CGI and Compass, including that

the District had reason to believe Dr. Campbell had tried to "steer business towards some minority firms and away from others" and confirming Dr. Campbell's termination.  *See* Ex. 23; Ex. 24; Ex. 25

Taken as a whole, a reasonable factfinder could conclude that the clear implication is that Mr. Turnage had objectively verifiable evidence that Dr. Campbell had engaged in contract steering; specifically, that she had contacted Ms. Ploog at CGI and instructed CGI to partner with Darryl Wiggins' company, Document managers dba Digidocs, that she had tried to steer Compass toward partnering with Cedric Simon, and that she was meeting with minority vendors to create a team to bid on the HIX.

The district should not avoid liability for its false and defamatory statements simply because they are couched as allegations.  Though phrased as allegations, the statements in Mr. Turnage's emails are based on a factual foundation that can be proven false, and thus constitute statements of fact.  *See e.g. Warren v. City of Junction City*, 207 F. Supp. 2d 1216, 1220 (D. Kan. 2002) (finding an article containing allegations that plaintiff obstructed justice, engaged in selective law enforcement, and mismanaged the police department contained statements of fact because when read in its entirety, the overall implication was the plaintiff had engaged in dishonest conduct based on objectively verifiable evidence, and defendant "created the impression the statements were true by acting on them and firing plaintiff").

Moreover, such statements, setting forth in detail the allegations against Dr. Campbell, are sufficiently precise and verifiable to support a claim of defamation and are provably false. *See e.g. Rosen v. Am. Isr. Pub. Affairs Comm.*, Inc., 41 A.3d 1250, (D.C. 2012) (distinguishing between statements that are not sufficiently precise or verifiable to support a claim of defamation, such as generalized statements that an employee was fired for actions "prejudicial to

the company" or being "disloyal," or "disruptive" and statements that include specific underlying incidents in support of the generalized claims, which, can be found provably false). As set forth in detail below, the District's intentional publication of the false and defamatory statements, caused Dr. Campbell severe financial harm. She was unable to find fulltime employment for two years, and has suffered lost earnings and lost earning capacity. The effects on Dr. Campbell's career and income are detailed in the vocational assessment by Anthony Bird attached as Exhibit 32 and Dr. Edelman's lost income and benefits attached as Exhibit 33.

### 2. Dr. Campbell did not instruct CGI to partner with Darryl Wiggins instead of Compass on Phase II of the HIX contract

Both Dr. Campbell and Mr. Wiggins deny that Dr. Campbell tried to force CGI to partner with Mr. Wiggins, Campbell Decl ¶ 28 ("I never suggested to the vice president of CGI that CGI should partner with any company, including Document Managers or Darryl Wiggins"); Wiggins Aff. ¶ 5 ("I have never had any discussions with Jennifer Campbell regarding a potential partnership between Digidoc and CGI").

According to Mr. Onyewuchi sometime around the end of April or May 2012, Ms. Ploog informed him that CGI would no longer partner with Compass on Phase II of the HIX contract pursuant to instructions from Dr. Campbell that they partner with Mr. Wiggins' company, Document Managers. Onyewuchi Dep at 36:8-38:4. Ms. Ploog, however, denies that she ever had any conversations with anyone from Compass regarding Dr. Campbell or that she told Mr. Onyewuchi that CGI would not partner Compass because Dr. Campbell required them to partner with Document Managers. Ploog Dep at 45.

More likely, CGI concocted false allegations because it viewed Dr. Campbell as an impediment to its award of Phase II of the HIX contract. Around the time CGI was campaigning for the HIX contract, CGI was negotiating with DHCF to secure another contract, the Health

22

Information Technology contract ("HIT").  Campbell Decl. ¶ 14.  Dr. Campbell noticed several contractual irregularities in the HIT contract, and on May 10, 2012, informed her staff that she was not ready to approve CGI's HIT contract due to "contractual irregularities, such as the lack of a liquidated damages clause and inconsistencies with the best and final offer (BAFO) and contract." Campbell Decl. ¶ 15; Turnage Dep. at 68:5-69:11.  The contracts division then discussed these issues with CGI, who resisted the changes.  *See* Ex. 11.

As a result of Dr. Campbell's refusal to sign off on CGI's contract without certain changes, CGI declined to purse the HIT contract.  Norton Dep at 13:20-17:22; Ex. 12 ("CGI got in a dispute with JC over contract language for this project.  They quietly believed she was stalling the contract until they would agree to take on Wiggins' firm as partner on the Exchange- I don't believe that"); Ex.13 ("the general counsel at CGI is furious with their VP for 'not closing the book' and walking away when JC started pushing.").

### 3.  Dr. Campbell did not Require that Cedric Simon be Project Manager on Compass' Phase I HIX Contract

In April of 2012, DHCF awarded Compass Phase I of the HIX.  Campbell Decl. ¶ 9. Compass was considering partnering with Carrie Brooks Brown Consulting Services (CBBS) and Cedric Simon, a consultant for CBBS, on the contract.  Onyewuchi Dep at 8:13-12:6.

According to Mr. Onyewuchi, during discussions with CBBS and Mr. Simon regarding a partnership on Phase I of the HIX, Carrie Brooks-Brown, owner of CBBS, and Mr. Simon told him that "the client wants him [Mr. Simon] to be the *project manager."*  Onyewuchi Dep at 13:5-12, though neither ever stated who they were referring to as the "client."  Onyewuchi Dep at 14:1-20:19.  Mr. Onyewuchi, inferred the "client" to mean Dr. Campbell after he received emails from Dr. Campbell, forwarded to him by Mr. Simon in connection with the HIX contract. Onyewuchi Dep at 16:4-17:3.

Dr. Campbell denies having any discussions with Mr. Simon or Ms. Brooks-Brown indicating that Mr. Simon was required to work on the contract and no emails exist through which it can reasonably it can reasonably be inferred that Dr. Campbell was requesting that Mr. Simon be on the contract.  Campbell Decl ¶ 13.

After the Phase I HIX contract was awarded to Compass, Dr. Campbell consulted Compass' organizational chart which it had submitted with its final proposal, determined its client/project liaison, Cedric Simon, and asked him to organize a contract kick off meeting.  *Id.*  ¶ 10.  The org chart lists Tracy Prigmore as Project Manager. *See* Ex. 6; Onyweuchi Dep at 22:9-11.  On April 10, 2012, a contract kickoff meeting was held to review standard District procedures.  *Id.* ¶ 11.

Mr. Onyweuchi also alleges that during Compass' contract kickoff meeting on April 10, 2012, Dr. Campbell made it clear that Mr. Simon must remain on Compass' contract when she opened Compass' proposal to the organization chart, a document submitted by Compass with its proposal in which Compass listed Mr. Simon as *client liaison,* and said nothing on here or no one on here should change.  Onyewuchi Dep at 22:9-11; 23:10-27:6; Ex. 2.  Despite previously believing that Dr. Campbell wanted Mr. Simon to be *project manager,* Mr. Onyewuchi inferred through Dr. Campbell's alleged actions during the meeting that she now required Mr. Simon to be *client liaison*.  Onyewuchi Dep at 25:16-19; 44:12-22.

Mr. Onyewuchi never had any conversations with Dr. Campbell regarding Mr. Simon's role on phase I of the HIX contract and no one from the District informed him that Mr. Simon was required to be on the contract.  Onyewuchi Dep. at 19:6-9; 20:5-8.  Dr. Campbell did not specifically mention Mr. Simon's name during the meeting.  Onyewuchi Dep at 26:20-27:6; Norton Dep at 15:19-16:6.

Dr. Campbell denies that she held up an organizational chart or pointed to Simon's name during the meeting  *Id.* ¶ 11-12.  Dr. Campbell testified that, during the kickoff meeting, she "informed Compass that any substantive changes to the final proposal, including staffing deliverables, and deliverable dates would need to be approved in writing through Bonnie Norton, their point of contact at DCHF." *Id.* ¶ 11; *See also* Ex. 6 ("Any proposed changes must be approved by the contract administrator").

Testimony from other District officials similarly contradicts Mr. Onyewuchi' s description of Dr. Campbell actions during the meeting.  Mr. Simon, Ms. Norton, and Mr. Walker all deny that Dr. Campbell acted inappropriately during the meeting.  Ex. 7,  Simon Aff'd ¶ 8, Norton Dep. at 11:7-15; Walker Dep at 7:3-8:14.

Mr. Simon recalls that Dr. Campbell informed the group that, together with the letter of agreement, the proposal was essentially the contract and there could be no deviations without approval from DHCF." Ex. 7, Simon Aff'd *¶ 8.*

Ms. Norton did not believe that Dr. Campbell acted inappropriately during the meeting, rather, as she recalled, Dr. Campbell said something to the effect of "if you are to change any staffing from what is on – what was on your proposal, you would have to let us know and we would have to approve it."  Norton Dep. at 11:7-15.  Ms. Norton did not find this unusual because, depending on the contract, it is standard practice to require approval of changes to proposed staff.  Norton Dep. at 15:19-16:22; 21-8:21:22.

Mr. Walker did not believe that Dr. Campbell acted inappropriately during the meeting and does not recall Dr. Campbell holding up Compass' organizational chart or stating that nothing or nobody on it should change.  Walker Dep at 7:3-8:14.

Notably, Mr. Onyewuchi's chronology of events outlining his allegations that he gave to Mr. Turnage does not even mention the kick-off meeting, does not mention any improper actions by Dr. Campbell, and in fact never mentions Dr. Campbell's name. *See* Ex. 14. Further inconsistencies include that, Mr. Turnage's chronology of events, states that "***After*** the meeting, Anthony alleged that Jennifer approached COMPASS with the company's organizational chart and tells him who she wants to see in what jobs and specifically points out Simon on the chart. 'I do not want any changes on this page.'" Ex. 15 at April 10th (emphasis added). Nevertheless, Mr. Turnage testified that Mr. Onyewuchi informed him that Dr. Campbell "instructed him ***verbally in front of everybody***" that she didn't want changes to the org chart. Turnage Dep at 64:20-65:4 (emphasis added).

### 4. Dr. Campbell was not Meeting with Minority Vendors in an Effort to Put together a Team to Bid on the HIX

Dr. Campbell's termination letter states that "At the June 3rd meeting with Mr. Turnage, COMPASS indicated that it was widely known that you have been meeting with minority vendors in an effort to put together a team that would submit a bid as a prime contractor for the health insurance exchange." Ex. 2. Dr. Campbell denies that she had been meeting with minority vendors in an effort to create a team to bid on the HIX contract. Campbell Decl ¶ 33-35. Mr. Turnage could not recall who reported to him that Dr. Campbell allegedly was putting together a team to bid on the HIX contract. Turnage Dep at 67:21-68:4. Mr. Onyewuchi testified that he did not inform Mr. Turnage that Dr. Campbell was putting together a team, except that he may have reported that CGI told him Dr. Campbell was putting together a team. Onyewuchi Dep at 47:20-48:6. Ms. Ploog testified that she never told Mr. Onyewuchi that Dr. Campbell was meeting with minority vendors to put together a team to bid on the health insurance contract. Ploog Dep at 46:5-13.

5.   **No Common Interest Privilege Applies because the District did not Act in Good Faith**

Whether a statement is privileged is a question of law.  *Carter v. Hahn*, 821 A.2d 890, 894 (D.C. 2003).  A statement is protected by common law privilege if it is "(1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has or honestly believes has a duty (3) to a person who has a corresponding interest or duty." *Payne v. Clark*, 25 A.3d 918, 925 (D.C. 2011).  The defendant bears the burden of proving the elements of the common interest privilege.  *Cloonan v. Holder*, 602 F. Supp. 2d 25, 32 (D.D.C. 2009).

If the Court determines the common law privilege to apply, the defendant "will be presumed to have been actuated by pure motives in its publication."  *Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990).  However, the privilege may be defeated by plaintiff upon a showing that it was made in malice, or bad faith.  *Id.*  Summary judgment is improper where genuine issues of material fact exist regarding whether the statements in question were made in malice.  *Payne*, 25 A.3d at 929-930.

The District Fails to Demonstrate that the Common Law Privilege Applies

The District had no duty to inform the media of the specific allegations made against Dr. Campbell and likewise, the media has no corresponding interest or duty in the internal investigation of such allegations.  Moreover, in disclosing such information to the media, the District likely violated its own Records Management and Privacy of Records regulations that prohibit unauthorized disclosure of employee personnel records. *See* D.C. Mun. Reg 6-B3100 *et seq.*  Courts have found the common interest privilege applicable to, for example, statements reporting suspected wrongdoing to law enforcement authorities, statements made by individuals to District agencies in the course of an investigation, and statements made to management

27

regarding the results of an internal sexual harassment investigation.  *See e.g. Payne*, 25 A.3d at 926; *Dickens v. Whole Foods Mkt. Group, Inc.*, 2003 U.S. Dist. LEXIS 11791 (D.D.C. Mar. 18, 2003); *Carter v. Hahn*, 821 A.2d 890 (D.C. 2003).  Here, by contrast, the District's statements were not made to "a person who has a corresponding interest or duty" as Defendant has not identified any specific interest the media had in Turnage's emails.

<u>The District Acted in Bad Faith</u>

The District's publication was not reasonably calculated to protect or further any interest in the public perception that it took such allegations seriously.  Rather, the District's primary motive in releasing Mr. Turnage's emails to the press was to injure a political opponent and destroy Dr. Campbell's reputation.  The facts simply do not support the District's contention that Mr. Murphy and Mr. Ribiero showed Turnage's emails to Mr. Suderman because Mr. Suderman was already aware of Dr. Campbell's alleged misconduct and they wanted the public to understand that the District took such allegations seriously.  Def's motion at p. 13.  Mr. Ribiero and Mr. Murphy's own testimony contradicts such an assertion.  Both testified that when they allowed Mr. Suderman to review Turnage's emails, they did not know whether he was aware of the specific allegations against Dr. Campbell, nor did Mr. Suderman offer any details regarding the extent of his knowledge.  Murphy Dep. at 7:19-22; Ribiero Dep. at 6:14-18.  Further, if public perception were in fact the true concern, the District could have easily asked Mr. Suderman what he was referring to and simply issued a statement that it took such allegations seriously and was in the process of investigating.

Mr. Turnage, himself, believed that his emails were intentionally leaked by someone in the Mayor's office.  After learning that Mr. Suderman had knowledge of his internal emails, Mr. Turnage emailed individuals in the Mayor's office asking how Suderman had obtained his

emails.  Ex. 26.  In response, someone from the Mayor's office called Turnage and informed him that he should talk to Mr. Murphy if he wanted to find out who had leaked the emails.  Turnage Dep at. 46:7-48:1.  Mr. Turnage then met with Mr. Murphy in Mr. Murphy's office for approximately 15 to 20 minutes, during which Mr. Murphy apologized to him and said he hoped that Mr. Turnage understood.  Turnage Dep. at 48:2-50:2; Murphy Dep. at 14:15-18:19.

Mr. Turnage testified that he did not know how Mr. Suderman obtained his emails and even though he met with Mr. Murphy for 15 to 20 minutes to discuss the leaked emails, he did not even ask Mr. Murphy who leaked the emails because "he apologized for the -- the event. That was sufficient for me."   Turnage Dep at 48:20-49:1.  More likely, Mr. Turnage did not ask who leaked his emails, because he knew the Mayor's office was responsible, a fact further confirmed by Mr. Murphy's apology.  Around this time, in a series of email exchanges with Janene Jackson, Director, Office of Policy and Legislative Affairs, regarding the leaked emails, Mr. Turnage wrote "My viscera tells me this was a Wilson Building Special" and subsequently that he had "Verified this morning.  Said they were approached about the story."  Ex. 27. Presumably, Mr. Turnage is referring to his conversation with Mr. Murphy.  Ms. Jackson responds, that she believed "It was leaked to get at a CM who isn't Catania."

Mr. Turnage's fleeting investigation of the allegations against Dr. Campbell, conducted in a matter of a few days, without any notes and prompt termination of Dr. Campbell within a little over a week, similarly suggests bad faith.  Mr. Turnage, who learned of the allegations made by Compass and CGI over the weekend of June 2-3, apparently investigated and concluded his investigation by the evening of Monday June 4, 2012.  *See* Ex. 17; Turnage Dep at 8:4 ("I concluded that Jennifer Campbell was steering contracts").  Notably, at no time did Turnage interview Dr. Campbell regarding the allegations against her.  Campbell Decl. at ¶18-23;

Turnage Dep. at 8-9, 22. Also, testimony by Bonnie Norton and Sam Walker, the individuals Turnage purportedly interviewed before corroborating the allegations, is at odds with Turnage's conclusion that Dr. Campbell was engaged in contract steering.

According to Mr. Turnage, Mr. Walker voluntarily approached him and reported that he had heard from members of the selection committee (who awarded Compass the Phase I HIX contract) that during the selection process Dr. Campbell was acting in ways that seemed to favor Compass and after Compass was awarded the contract, there were questions about the way she handled the contract kickoff meeting with Compass.  Turnage Dep at 30:17-33:12.  Mr. Walker, however, denies that he ever had any conversation with Mr. Turnage regarding Dr. Campbell.  Walker Dep at 9:1-3.  Mr. Walker also never had any discussions with members of the selection committee regarding Dr. Campbell, no one ever approached him with concerns regarding Dr. Campbell, and no one ever raised concerns to him about the way Dr. Campbell handled the kickoff meeting.  Walker Dep at 9:4-10:18.

According to Mr. Turnage, he also met with Bonnie Norton (a member of the selection committee that awarded Compass the contract, and who also attended Compass' contract kickoff meeting) who confirmed that Dr. Campbell rated Compass more favorably in the selection process whereas all of the other members rated the other company higher.  Turnage Dep at 33:17-35:16. According to Mr. Turnage, Ms. Norton also confirmed that Dr. Campbell held up Compass' organizational chart during the kickoff meeting.  *Id.*

Ms. Norton, however, testified that she told Mr. Turnage that Compass was selected per OCP guidelines and she did not discuss anything else about the selection panel with Mr. Turnage. Norton Dep at 9:11-16.   She also did not believe Dr. Campbell acted inappropriately during

Compass' contract kickoff meeting and never informed Turnage that she believed Dr. Campbell behaved inappropriately during the kickoff meeting.  Norton Dep at 21: 8-15.

Factual issues also remain as to whether Mr. Turnage, CGI, and Compass created false allegations against Dr. Campbell because they viewed her as an impediment to CGI being awarded Phase II of the HIX contract (and Compass partnering with CGI) and as a result, wanted to remove her.  During her employment, Dr. Campbell believed that Mr. Turnage was favoring CGI because CGI was offered meetings and demonstrations, regarding phase II of the HIX that other contractors were not, all arranged by Turnage, or Dr. Campbell at the request of Mr. Turnage. Dr. Campbell, on numerous occasions objected to Mr. Turnage's meetings with CGI and what she perceived as his preferential treatment toward CGI.  Campbell Decl at ¶36-43.   Additionally, shortly after she became COO, in May 2012, Mr. Turnage asked her to sign off on CGI's HIT contract, despite contractual irregularities and he and his assistant followed up with her daily regarding the status of the contract.  Campbell Decl ¶ 17.  Dr. Campbell informed Mr. Turnage during the last week of May 2012, that she would not sign off on CGI's contract due to the contractual irregularities.  *Id.* at 18.  Shortly thereafter, during the first week of June 2012, Dr. Campbell was falsely accused of contract steering, on June 4, 2012 she was placed on administrative leave on, and on June 11, 2012 her employment was terminated effective, June 26, 2012.

In *Payne*, the Court of Appeals found the plaintiff's opposition and exhibits were sufficient to raise a question of fact as to whether defendant had acted in good faith, or if it had acted to cause "Mr. Payne to be fired from his position as an elevator inspector, or as [defendant's employee] put in her email… 'to make sure [Mr. Payne] never returns [to DCRA].'"  *Payne*, 25 A.3d at 928.  Similarly, here, summary judgment is inappropriate where

credibility determinations and factual issues regarding whether the District acted in bad faith or with malice necessitate a trial.

2. Stigma or disability

The basis of a stigma or disability claim is not the defamatory nature of the official speech, but the "combination of an adverse employment action and 'a stigma or other disability that foreclose[s] [the plaintiff's] freedom to take advantage of other employment opportunities.'" *O'Donnell v. Barry,* 148 F.3d 1126, 1140 (D.C. Cir. 1998) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972)).  Such stigma or disability may be found where the official action either (a) automatically bars Plaintiff from a specific set of positions within the government, or (b) generally blocks her from pursuing employment in her chosen field of interest.  *See Kartseva v. State Dep't*, 37 F.3d 1524, 1529 (D.C. Cir. 1995).

In *Kartseva v. State Department*,  the court found that the State Department's termination of a translator based on unspecified "counterintelligence concerns" could support  a liberty interest claim if the effect of termination was to formally exclude plaintiff from certain categories of government work or to  broadly preclude translator from pursuing chosen career as translator.  *Id.   See also M.K. v. Tenet,* 196 F. Supp. 2d 8, 16 (D.D.C. 2001).

As the D.C. Circuit explained, a claim requires that the government either (1) has deprived one of a legal right or (2) has so severely impaired one's ability to take advantage of a legal right, such as a right to be considered for government employment, that the government can be said to have foreclosed one's ability to take advantage of it and thus extinguished that right.  *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983).  The nature of the allegedly defamatory statements is not necessarily central to a "stigma or disability" claim, because such a claim turns on an official action, for example a termination of employment, that itself "'has the effect of seriously affecting, if not destroying, a plaintiff's ability to pursue his [or her] chosen profession,

or 'substantially reducing the value of his [or her] human capital [.]'" *O'Donnell,* 148 F3d at

1141 (citation omitted). Such an action implicates the due process clause because "' [t]he

Constitution protects an individual's 'right to follow a chosen trade or profession' without

governmental interference." *Id.* (quoting *Kartseva*, 37 F.3d at 1529).

### A.   Plaintiff has been Excluded from her Chosen Field

Dr. Campbell has been foreclosed from reentering the field of healthcare

finance/healthcare management.  Despite applying for over 30 jobs, from June 6, 2012, when her

employment with DHCF was terminated, until July 2014, Plaintiff did not receive any job offers

and was unable to obtain fulltime employment of any kind.  See Ex. 34; Campbell Decl ¶45.

The district's public dissemination of the false allegations against Dr. Campbell stigmatized her

reputation to the extent that Anthony Bird, vocational-rehabilitation counselor and vocational

consultant, believes that her career in health care management/health care finance is over.  *See*

Ex.32.  According to Mr. Bird, Dr. Campbell's "short- and long-term employment and earning

power have been adversely affected by her conflicts with and lawsuit against DHCF" and

prospective employers, conducting a search of her will be dissuaded from hiring her because

"carries the taint of suspicion."  *Id.*

This has been Plaintiff's experience.  In July 2012, Plaintiff applied for a position as

Director Healthcare Management Consulting with Planned Parenthood, went through multiple

rounds of interviews, including flying to Atlanta to interview with the CEO of Planned

Parenthood Southeast, and was a top candidate for the position.  Campbell Decl ¶ 46-49.

Suddenly, Planned Parenthood obtained a copy of Mr. Craig's article in the Washington Post,

and specifically informed Dr. Campbell that they needed to talk to their general counsel, there

were concerns about hiring her because there was an active Inspector General investigation being

conducted by the District, and that she was potentially a liability to Planned Parenthood. Campbell Decl at ¶50-52; Ex. 28; Ex. 29.  After receiving a copy of the article, Planned Parenthood declined to hire Dr. Campbell.  .

From her termination from DHCF on June 26, 2012 until July 2014, the only work that Dr. Campbell was able to perform included temporary work on two contracts through her consulting company, J. Blakely Campbell & Associates and work teaching as an Adjunct Assistant Professor for a Public Health Administration course at the Maryland University College (UMUC) for one semester from February 4, 2013 through April 29, 2013.  Campbell Decl ¶ 53.

The temporary work that she performed through her consulting company included one contract with Health Dimension Group, an intermediate care facility under which she developed a business/needs assessment plan for their expansion into another market and another contract with the Wright Group under which she traveled to various sites to conduct public health training on the intersection between HIV and domestic violence/ violence against women.  *See* Ex. 30; Ex. 31; Campbell Decl ¶ 54.  Neither Plaintiff's contract work as a consultant through her LLC, J. Blakely Campbell & Associates nor her work as an adjunct professor constitutes work within the field of Healthcare Finance/management.  Campbell Decl  ¶ 55.

Moreover, it took Plaintiff two years after her termination from DHCF to find a fulltime position.  In July 2014, Dr. Campbell finally obtained employment as a Senior Consultant with Cognosante in an operations consulting/quality assurance role, earning $10,000 less than her annual salary at DHCF.  Campbell Decl ¶56.  Her job duties include overseeing and implementing open enrollment for federally-funded state marketplaces as a consultant to the Center for Medicare & Medicaid Services (CMS).  This is an operations consulting role as

opposed to the finance/payor side of her former field of healthcare management/finance.

Campbell Decl ¶57.  In the two years since she was fired by DHCF, Dr. Campbell earned $20, 689,

$279,311 less than she would have earned had she not been fired.  *Id.* at ¶ 53.  Accordingly, a

reasonable jury could find that Dr. Campbell has been precluded from employment

## II.     PLAINTIFF CAN ESTABLISH A CLAIM UNDER THE D.C. WHISTLEBLOWER PROTECTION ACT

To establish a prima facie case under the D.C. Whistleblower Protection Act (DC WPA),

a plaintiff must show that she "made a protected disclosure, that a supervisor retaliated or took or

threatened to take a prohibited personnel action against her, and that her protected disclosure was

a contributing factor to the retaliation or prohibited personnel action."  *Wilburn v. District of*

*Columbia*, 957 A.2d 921, 924 (D.C. 2008).

Protected disclosures under the DC WPA include, "any disclosure of information, not

specifically prohibited by statute, without restriction to time, place, form, motive, context, forum,

or prior disclosure made to any person by an employee or applicant, including a disclosure made

in the ordinary course of an employee's duties by an employee to a supervisor or a public body

that the employee reasonably believes evidences: (A) Gross mismanagement; (B) Gross misuse

or waste of public resources or funds; (C) Abuse of authority in connection with the

administration of a public program or the execution of a public contract; (D) A violation of a

federal, state, or local law, rule, or regulation, or of a term of a contract between the District

government and a District government contractor which is not of a merely technical or minimal

nature; or (E) A substantial and specific danger to the public health and safety."  D.C. Code § 1-

615.52 (a) (6).

Prohibited personnel actions includes, but is not limited to, "recommended, threatened, or

actual termination" as well as "retaliating in any other manner against an employee because that

employee makes a protected disclosure or refuses to comply with an illegal order, as those terms are defined in this section." D.C. Code § 1-615.52 (a) (5) (A).

"A plaintiff may show causation through direct evidence or circumstantial evidence, such as by showing . . . a close temporal proximity between the employer's knowledge and the adverse actions." *Clayton v. District of Columbia*, 931 F. Supp. 2d 192, 202 (D.D.C. 2013) (citing *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 77 (D.D.C. 2007). "While an employee makes a prima facie case by showing that the 'protected disclosure' was a 'contributing factor' to the disciplinary action, a jury must find a direct causal link." *Johnson v. District of Columbia*, 935 A.2d 1113, 1119 (D.C. 2007) (citing *Crawford v. District of Columbia*, 891 A.2d 216, 221 (D.C. 2006) (emphasis added). Courts have also found a causal connection where the evidence as a whole raises an inference of retaliation. *See e.g. Buggs v. Powell*, 293 F. Supp. 2d 135, 149 (D.D.C. 2003) ("the proffered evidence, looked at as a whole, may suffice to raise the inference").

Once a Plaintiff makes a prima facie case, "the burden shifts to the defendant to show by clear and convincing evidence that the plaintiff's dismissal would have occurred for "legitimate, independent reasons" even if he had not engaged in activities protected under the Act. *Crawford v. District of Columbia*, 891 A.2d 216, 219 (D.C. 2006) citing D.C. Code 1-615.54 (b). "If the defendant can articulate such a reason for the action, plaintiff then bears the burden of proving that the explanation for the action is a pretext." *Coleman v. District of Columbia*, 893 F. Supp. 2d 84, 101 (D.D.C 2012) (citing *Crawford,* 891 A.2d at 218.

**Plaintiff can Establish a Prima Facie Case**[1]

In or around August 2011 and again sometime after August or September 2011, Dr. Campbell reported to Mr. Turnage, her supervisor, that she felt the meetings/demonstrations he was having with CGI pursuant to his "open door policy" were premature and could show favoritism toward CGI.  Campbell Decl. ¶ 37-43.

Specifically, during a meeting in August 2011, Mr. Turnage requested that Dr. Campbell speak with CGI regarding their prior experience with health insurance exchange contracts in other states.  In response, Dr. Campbell informed him that she felt this was premature because the preliminary assessment regarding whether the District would have its own health insurance exchange or be part of the federal exchange had not yet been completed and it was also unclear what the Department of Health and Human Services requirements for the exchange would be. *Id.* at 39.  Thereafter, CGI did two presentations for DHCF, arranged by Mr. Turnage, the first in August or September 2011, the second on May 15, 2012.  *Id.* at 40.  Sometime after the first meeting, Dr. Campbell again informed Mr. Turnage that she felt the meetings with CGI were premature and that they could show favoritism toward CGI because other contractors were not given the opportunity to provide similar presentations.  *Id.* at 41.

After becoming COO in April 2012, Dr. Campbell informed Mr. Turnage that he needed to modify his "open door policy" and needed to asses who he was meeting with carefully.  *Id.* at 42.  During subsequent meetings with Mr. Turnage, she reiterated that she felt his "open door policy" could have potential negative consequences.  *Id.* at 43.

In May 2012, Mr. Turnage asked Dr. Campbell to sign off on CGI's HIT contract, despite contractual irregularities and he and his assistant followed up with her daily regarding the status

---

[1] The District does not dispute that Dr. Campbell engaged in protected disclosures or that she can establish a prima facie case.  *See* Def's Motion at 17-18.

of the contract.  *Id.* at 17.  Dr. Campbell refused to do so and, during the last week of May 2012, informed Mr. Turnage that she would not sign off on CGI's contract due to the contractual irregularities.  *Id.* at 18.

Dr. Campbell reasonably believed that Mr. Turnage was abusing his authority by offering CGI meetings and demonstrations regarding phase II of the HIX that other contractors were not. Dr. Campbell's statements and objections to Mr. Turnage constitute protected disclosures.  *See e.g. Carter v. District of Columbia*, 980 A.2d 1217, 1225-1226 (D.C. 2009) (Protected disclosures include "disclosure of information to a supervisor that the employee reasonably believes evidences a violation of any D.C. law, rule, or regulation").

Temporal proximity exists between Dr. Campbell's protected disclosures regarding Mr. Turnage's favoritism toward CGI (on numerous occasions between approximately September 2011 and April 2012) and her placement on administrative leave on June 4, 2012, and termination on June 11, 2012, effective June 26, 2012.  *See e.g. Buggs*, 293 F. Supp. 2d at 148 (stating temporal proximity must be under three months).

Further, taken as a whole, Dr. Campbell's protected disclosures through April 2012, her refusal to sign off on CGI's HIT contract in May 2012, followed closely by the false contract steering allegations raised over the weekend of June 2-3, Mr. Turnage's alleged substantiation of the allegations and placement of Dr. Campbell on administrative leave the following day, on Monday June 4, 2012, and Mr. Turnage's decision to terminate her employment on June 11, 2012, effective June 26, 2012 raise an inference of retaliation.

### Plaintiff's Termination was not for Legitimate Independent Reasons

Plaintiff's employment was not terminated as a result of "serious allegations about contract steering" from CGI and Compass.  Rather, the District (along with Compass, and CGI)

concocted the false allegations against Dr. Campbell because Mr. Turnage (and CGI) viewed Dr. Campbell as an impediment to CGI being awarded the HIX contract after Dr. Campbell continued to object to Mr. Turnage's favoritism of CGI, and refused to sign off on CGI's HIT contract.

 As set forth in detail above, the allegations against Dr. Campbell are false, and Mr. Turnage's cursory investigation in a matter of days, coupled with the timing of the false allegations raised on a Saturday and Sunday, days after Dr. Campbell informed Mr. Turnage she would not sign off on CGI's HIT contract, taken as a whole, creates an inference of retaliatory discrimination.

The District cannot show by clear and convincing evidence that Dr. Campbell was terminated over the false contract steering allegations set forth in her termination letter because testimony by its own employees, who attended the meetings with Dr. Campbell, confirms that she did not act inappropriately.  Accordingly, a reasonable juror could find that the District's reasons were pretextual.

### III.     PLAINTIFF CAN STATE A WRONGFUL DISCHARGE CLAIM

In *Adams v. George W. Cochran & Co*, the District of Columbia Court of Appeals recognized an exception to the at-will employment doctrine where an employee is discharged solely for refusing to violate the law.  *Adams v. George W. Cochran & Co.,* 597 A.2d 28, 32 (D.C. 1991).  In *Carl v. Children's Hosp.*, the D.C. Court of Appeals broadened its holding in *Adam*s and held that the wrongful discharge doctrine applied in circumstances under which an employee was terminated in contravention of a public policy as reflected in a statute or regulation. *Carl v. Children's Hosp.*, 702 A.2d 159, 163 (D.C. 1997).

To establish a claim of wrongful termination in violation of public policy, a plaintiff must show that her termination was in contravention of an "identifiable policy" that has been "officially declared in a statute or municipal regulation, or in the Constitution."  *Byrd v. VOCA Corp.*, 2011 D.C. Super. LEXIS 8 (D.C. Super. Ct. 2011) (quoting Carl, 702 A.2d at 165)). "[T]here must be a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination." *Id.*

Dr. Campbell's employment was terminated because, unlike Mr. Turnage, she refused to favor CGI by agreeing to modify CBE guidelines and overlook the discrepancies in CGI's contracts pending before the DCHF.  In May 2012, in response to CGI's inquires about "how black and white" the CBE requirement was, Dr. Campbell informed CGI that a waiver would not be permitted "due to the magnitude of the contract."[2]  Campbell Decl ¶ 19.  Later in the end of May 2012, Dr. Campbell refused to sign off on CGI's HIT contract, due to the lack of a liquidated damages clause, and discrepancies between the BAFO and the contract, despite Mr. Turnage and his assistant's daily follow ups.  *Id.* at 18.

Under D.C. Code § 2-218.46(a)(2), District agency contracts in excess of $250,000 require use of  35% certified business enterprises, unless a waiver was approved by the Office of Contract and Procurement (OCP).  *See also* Procurement Practices Reform Act of 2010, D.C. Act 18-723, Title I (b) (2) (Feb. 3, 2011) (stating the Acts purpose is to "foster effective and equitably broad-based competition in the District by supporting the free enterprise system and the certified business enterprise program as set forth in the Small, Local, and Disadvantaged Business Enterprise Development and Assistance Act of 2005").  Further, it is the public policy

---

[2] OCP had not granted a waiver.  Campbell Decl ¶ 19.

of the District of Columbia "To ensure the fair and equitable treatment of all persons who deal

with the procurement system of the District government."  *Id.* at Title I (b) (4).

As a result of her refusal to violate the law and waive the CBE requirement and her

refusal to favor CGI in the contracting process, in contravention of the public policy of the

District of Columbia, CGI and Turnage viewed Dr. Campbell as an impediment to CGI's award of

Phase II of the HIX contract.   CGI, Compass, and Mr. Turnage then decided that Dr. Campbell had

to be removed from DHCF.

## I.  STANDARD FOR SUMMARY JUDMENT

Summary judgment may be granted only if "there is no genuine issue as to any material fact

[and] the moving party is entitled to judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247 (1986).  A dispute about a material fact "is genuine if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  In deciding a motion

for summary judgment, the court must view the facts and the reasonable inferences from the facts

"in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "[I]f reasonable minds could differ as to the import

of the evidence ... a verdict should not be directed."  *Anderson*, 477 U.S. at 250-51.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment should be denied.

Date:  October 1, 2014                    Respectfully submitted,


_____/s/_____
Constance Travanty, (#1007223)
Alan Lescht & Associates, PC
1050 17th Street, NW, Suite 400
Washington, DC 20036
constance.travanty@leschtlaw.com
T: 202.463.6036
F: 202.463.6067

<u>CERTIFICATE OF SERVICE</u>

   I hereby certify that, on this 1st day of October 2014, I caused the foregoing to be served via ECF on the following persons:

Sarah L. Knapp
Brant Martin
Assistant Attorney General
Civil Litigation Section III
Office of the Attorney General for the District of Columbia
441 4th Street, NW, Suite 630 Main
Washington, DC 20001

       _____/s/_____
        Constance Travanty

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JENNIFER B. CAMPBELL, DR. PH.      )
                                   )
          Plaintiff,               )          Case No. 1:12-cv-01769-RC
                                   )
v.                                 )
                                   )
DISTRICT OF COLUMBIA               )
                                   )
          Defendant.               )

ORDER

Upon consideration of Defendant's Motion for Summary Judgment and Plaintiff's

Opposition thereto, it is hereby ORDERED that the Motion is DENIED.

IT IS SO ORDERED.

Date: _____

_____
Judge Rudolph Contreras
U.S. DISTRICT COURT JUDGE