# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JENNIFER B. CAMPBELL, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 12-1769 (RC) |
| | : | | |
| v. | : | Re Document No.: | 24 |
| | : | | |
| DISTRICT OF COLUMBIA, | : | | |
| | : | | |
| Defendant. | : | | |

## <u>MEMORANDUM OPINION</u>

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Dr. Jennifer B. Campbell brought this action after she was terminated by her employer the District of Columbia amid allegations that she had attempted to steer government contracts toward certain parties.  In the claims that remain pending, Campbell contends that the District deprived her without due process of the right to pursue her profession, retaliated against her for protected whistleblowing activity in violation of the D.C. Whistleblower Protection Act, and wrongfully discharged her in violation of D.C. common law.  The District has moved for summary judgment on each of these claims.  The Court denies the District's motion as to the procedural due process claim because Campbell has created a genuine dispute of material fact as to the deprivation of her liberty interest, and because the District does not contend that she received constitutionally sufficient process.  The Court also denies the motion as to the Whistleblower Protection Act claim because the District has failed to prove by clear and convincing evidence that Campbell would have been terminated for legitimate, independent reasons even had she not engaged in activity protected by the Act.  Lastly, the Court enters

judgment for the District on Campbell's wrongful discharge claim because the public policy it

seeks to vindicate is already protected by the Whistleblower Protection Act.

## II.  FACTUAL BACKGROUND[1]

### A.  Campbell's Employment

In 2011, Campbell served as Director of Health Care Reform and Innovation

Administration in the D.C. Department of Health Care Finance ("DHCF").  *See* Campbell Decl.

¶ 2, Pl.'s Ex. 1, ECF No. 25-2.  In that role, Campbell oversaw the bidding process for contracts

for establishing the District's health insurance exchange pursuant to the Patient Protection and

Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010).  *See id.* ¶¶ 6–7.

In the course of managing the bidding process, Campbell came to assert opinions

different from those held by DHCF Director Wayne Turnage, with whom she worked closely.

*See* Campbell Dep. at 25:14–26:2, Def.'s Ex. A, ECF No. 24-2.  First, beginning around August

2011, she objected to Turnage's "open door policy" that encouraged meetings with prospective

vendors, which she perceived as actually favoring CGI Technologies and Solutions, Inc.

("CGI"), a firm with which Turnage had previous dealings.  *See* Campbell Decl. ¶¶ 36–43, Pl.'s

Ex. 1.  Additionally, in May 2012, Campbell refused to execute a contract previously awarded to

CGI, on the basis that it lacked a liquidated damages clause and was inconsistent with CGI's

final offer, and she remained adamant even after Turnage pressured her to approve the

agreement.  *See id.* ¶¶ 15–18; *see also* Campbell Dep. at 42:5–66:17, Def.'s Ex. A.

---

[1] In ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Accordingly, where facts are disputed, the Court will view the evidence in the light most favorable to Campbell.

In May 2012, Campbell was promoted to Chief Operating Officer ("COO").  *See* Campbell Decl. ¶ 2, Pl.'s Ex. 1.  The COO was an Excepted Service position, meaning that the role primarily entailed handling policy or confidential matters and required reporting directly to an agency head.  *See* Termination letter of June 11, 2012, Pl.'s Ex. 2, ECF No. 25-2; *see also* D.C. Code § 1–609.02 (describing Excepted Service personnel).  Her annual salary as COO was $146,000.  *See* Campbell Decl. ¶ 2, Pl.'s Ex. 1.  As COO, Campbell continued to work closely with Turnage on implementing the District's health insurance exchange.  *See id.* ¶ 7; Campbell Dep. at 25:14–26:2, Def.'s Ex. A.

### B. Allegations Concerning Contract Steering

In early June 2012, unbeknownst to Campbell, Turnage learned of allegations that she had attempted to interfere improperly both with Phase I of the health insurance exchange contract, which had been awarded months earlier to Compass Solutions, LLC ("Compass"), and with the bidding process for Phase II.  First, Campbell had allegedly required Compass to hire consultant Cedric Simon for its work on Phase I.  *See* Onyewuchi Dep. at 42:1–11, Pl.'s Ex. 3, ECF No. 25-2.  Second, Campbell had reportedly asked CGI to abandon plans to partner with Compass in bidding on Phase II and to partner instead with Document Managers, which was owned by Darryl Wiggins, an advisor to a D.C. Councilmember.  *See id.* at 38:1–42:11; Campbell Decl. ¶¶ 27–30, Pl.'s Ex. 1.  Third, Campbell had allegedly attempted to organize a team of minority vendors to bid as a prime contractor for the health insurance exchange.  *See* Onyewuchi Dep. at 47:20–48:6, Pl.'s Ex. 3; *see also* Termination letter of June 11, 2012, Pl.'s Ex. 2 (summarizing allegations).

According to Campbell's evidence, all three allegations were false.  *See* Campbell Decl. ¶¶ 27–35, Pl.'s Ex. 1.  The allegation that she expressly required Compass to hire Simon for the

Phase I contract is denied by Simon himself and by two other individuals who attended the kick-off meeting at which Campbell purportedly imposed the requirement; Campbell's evidence shows that in accordance with standard practice, she explained only that approval would be needed for any changes to the project team outlined in Compass's proposal. *See* Simon Aff. ¶ 8, Pl.'s Ex. 7, ECF No. 25-2; Norton Dep. at 11:7–15, 15:19–16:22, Pl.'s Ex. 5, ECF No. 25-2; Walker Dep. at 7:3–8:14, Pl.'s Ex. 4, ECF No. 25-2.  Moreover, Campbell denies the allegation that she asked CGI to partner with Wiggins's company Document Managers, and Wiggins claims that he and Campbell never discussed such an arrangement. *See* Campbell Decl. ¶¶ 20, 28, Pl.'s Ex. 1; Wiggins Aff. ¶ 5, Pl.'s Ex. 9, ECF No. 25-2.  Lastly, Campbell avers that she never sought to assemble a minority vendor team, and an executive at CGI—purportedly the source of the allegation—testified that she never made such reports. *See* Campbell Decl. ¶¶ 33–35, Pl.'s Ex. 1; *compare* Onyewuchi Dep. at 47:20–48:6 (Compass executive attributing allegation to CGI), *with* Ploog Dep. at 46:5–13, Pl.'s Ex. 16, ECF No. 25-4 (CGI executive stating that she never told Compass's Onyewuchi that Campbell was meeting with minority vendors).

### C.  Campbell's Termination

On June 3, 2012, while attending a conference in Tennessee, Campbell was summoned back to D.C. for an urgent meeting with Turnage, set for the following day. *See* Campbell Decl. ¶ 21, Pl.'s Ex. 1.  On June 4, Turnage's Chief of Staff and a human resources official met with Campbell and told her that she would be placed on administrative leave.  Campbell was provided no explanation and was promptly disconnected from DHCF property and escorted out of the office. *Id.* ¶ 22; Turnage email of June 4, 2012, Pl.'s Ex. 17, ECF No. 25-4.  That same day, she received a letter from the Department of Human Resources placing her on administrative leave

during the pendency of a "preliminary investigation into inappropriate conduct" at DHCF.

Stokes letter of June 4, 2012, Pl.'s Ex. 18, ECF No. 25-4.  Campbell attempted unsuccessfully to

schedule a meeting with Turnage.  *See* Campbell Decl. ¶ 23, Pl.'s Ex. 1.

The night of June 4, Turnage sent an email to the Mayor's Chief of Staff Chris Murphy

and others, providing various "updates" on Campbell.  Turnage email of June 4, 2012, Pl.'s Ex.

17.  His email explained that he had personally confirmed, through conversations with Compass

and CGI representatives, the allegations that Campbell had attempted to steer contracts to certain

parties, and reported that Campbell had been placed on administrative leave as of that morning.

*Id.*  The email explained Turnage's findings that, after the allegations surfaced, Compass and

CGI had promptly terminated contact with Wiggins and that Compass had fired Simon, who

"knew that Jennifer had been sent home—an indication that she likely called him."  *Id.*  Turnage

further observed that "[c]uriously," Campbell had not contacted him since she was summoned

back to D.C.  *Id.*  Summing up, Turnage wrote: "This concludes my investigation of this issue

and I will inform [Department of Human Resources] Director Stokes that I am firing Jennifer

Campbell."  *Id.*  Days later, Turnage sent a follow-up email to Murphy and others that detailed

his meeting with Wiggins, which meeting—in his judgment—further confirmed his earlier

findings of wrongdoing.  *See* Turnage email of June 6, 2012, Pl.'s Ex. 17.  Turnage did not meet

with Campbell to discuss the allegations against her.  *See* Campbell Decl. ¶¶ 21–26, Pl.'s Ex. 1.

On June 11, 2012, Campbell received a letter notifying her of her termination, which

would take effect on June 26, 2012.  *See* Termination letter of June 11, 2012, Pl.'s Ex. 2.  The

letter summarized Turnage's findings and stated that Campbell's three counts of misconduct

were each "violations of the District's ethical standards and [were] the basis for [her] separation

for cause."  *Id.*  In closing, the letter confirmed that Campbell would remain on administrative

leave with pay until the effective date of her separation, and noted that she was "not entitled to receive separation pay" because her termination was for cause.  *Id.* (citing D.C. Code § 1–609.03(f)).

### D.  Disclosures to the Press

Meanwhile, *Washington City Paper* reporter Alan Suderman got wind of the controversy surrounding Campbell.  Suderman initially sought out information about Campbell by calling Pedro Ribiero, Director of Communications in the Executive Office of the Mayor.  On the phone, Ribiero explained that he did not know of Campbell or of "what was going on" with her.  Ribiero Dep. at 6:2–21, 13:13–21, Pl.'s Ex. 21, ECF No. 25-5.  Later, on June 7, 2012, Suderman sent an email to Ribiero again inquiring about Campbell.  Suderman-Ribiero-Murphy emails of June 7, 2012, Pl.'s Ex. 20, ECF No. 25-5.  This time, Ribiero obtained from Murphy paper copies of Turnage's emails concerning Campbell, and then allowed Suderman to review and take notes on the emails.  *See* Ribiero Dep. at 6:2–8:1, 8:15–22, Pl.'s Ex. 21.  Neither Ribiero nor Murphy knew whether Suderman, before reviewing the emails, had any knowledge of the specific allegations against Campbell.  *See* Murphy Dep. at 7:19–22, Pl.'s Ex. 22, ECF No. 25-5; Ribiero Dep. at 6:14–18, Pl.'s Ex. 21.

On June 10, 2012, Suderman called Turnage.  Suderman read excerpts of the emails to Turnage and threatened to use them directly for his article if Turnage did not comment.  *See* Turnage Dep. at 42:20–46:4, Pl.'s Ex. 10, ECF No. 25-3.  That evening, Turnage forwarded his emails to Suderman, each prefaced by various updates, corrections, and clarifications.  *See* Turnage-Suderman emails of June 10, 2012, Pl.'s Ex. 23, ECF No. 25-5.  Specifically, Turnage asked Suderman to "emphasize" a statement in one of his emails that "[i]t goes without saying

that this process should be conducted confidentially for the protection of . . . the agency and out of respect for Jennifer's potential innocence." *Id.*

On June 11, 2012, Suderman published an article in the *Washington City Paper* reporting that Campbell had been terminated on the basis of the three contract-steering allegations. *See* Health Care Finance COO Fired Over Contract Steering Allegations, *Washington City Paper*, June 11, 2012, Pl.'s Ex. 24, ECF No. 25-5. Campbell first learned of the allegations against her by reading Suderman's article, and she subsequently refused to meet with Turnage. *See* Campbell Decl. ¶ 26, Pl.'s Ex. 1. The following day, another reporter published a similar article in the *Washington Post*. *See* D.C. Official Is Fired Over Contract Allegations, *Washington Post*, June 12, 2012, Pl.'s Ex. 25, ECF No. 25-5.

### E. Fallout and Legal Proceedings

After her termination, Campbell had difficulty securing full-time employment. She applied without success to over thirty positions. *See* Job search log, Pl.'s Ex. 34, ECF No. 25-6; Campbell Decl. ¶ 45, Pl.'s Ex. 1. During the period between her June 2012 termination and July 2014, she performed temporary work as a consultant and adjunct professor, though she earned a total of only $20,689, and none of these positions was within her chosen field of healthcare finance and management. Campbell Decl. ¶¶ 53–55, Pl.'s Ex. 1. On one occasion, in the fall of 2012, a prospective employer expressly told her that news reports concerning her departure from DHCF had raised concerns that she would be a "liability," before that employer decided to hire another candidate. *See id.* ¶¶ 51–52; Planned Parenthood emails, Pl.'s Ex. 29, ECF No. 25-6. According to a 2013 "Vocational Assessment" by a vocational rehabilitation counselor, Campbell's lack of success in finding new employment was attributable to the "taint of

suspicion" arising from the ready online availability of the allegedly defamatory articles and subsequent reports of her lawsuit. *See* Vocational Assessment, Pl.'s Ex. 32, ECF No. 25-6.

In October 2012, Campbell filed the instant action against the District and Turnage. *See generally* Compl., ECF No. 1. The complaint asserts that she was deprived without due process of her liberty interest in pursuing her profession, in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983;[2] that she was punished for her attempts to report a false or fraudulent claim, in violation of the D.C. False Claims Act, D.C. Code §§ 2–381.01 *et seq.*; that she suffered retaliation for her disclosures of irregularities in the CGI contract she refused to execute, in violation of the D.C. Whistleblower Protection Act, D.C. Code §§ 1–615.51 *et seq.* ("DCWPA"); and that she was terminated against public policy, in violation of D.C. common law. *See* Compl. ¶¶ 76–99. The complaint requests compensatory and punitive damages and an order directing the District to retract its statements and to publish an apology in the *Washington City Paper* and *Washington Post*. *See id.* at 16. Subsequently, on the defendants' motion to dismiss, the Court dismissed Turnage from the action and dismissed the False Claims Act claim, but denied the motion as to Campbell's procedural due process, DCWPA, and wrongful termination claims. *See Campbell v. District of Columbia*, 972 F. Supp. 2d 38, 51 (D.D.C. 2013) (ECF No. 12).[3]

---

[2] Although the complaint styles the constitutional claim as one for "constitutional defamation," a phrase that the Court adopted in its previous opinion, this Memorandum Opinion refers to the claim as a procedural due process claim. "Defamation" is relevant only to the "reputation-plus" theory of the liberty interest at issue. *See O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998). By contrast, "procedural due process" reflects the full doctrinal framework governing Campbell's claim. *See, e.g.*, *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1112–14 (D.C. Cir. 1985); *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983).

[3] The Court also granted Campbell leave to amend her complaint, but she did not do so. *See Campbell*, 972 F. Supp. 2d at 51; Def.'s Notice of Filing, ECF No. 13 (Oct. 25, 2013).

In July 2014, Campbell was hired into a full-time consulting position in her chosen field of healthcare finance and management.  *See* Campbell Decl. ¶ 56–58, Pl.'s Ex. 1.  Her annual salary in this role is $136,000.  *Id.* ¶ 56.

Following discovery, the District moved for summary judgment.  *See* ECF No. 24.  The motion has been fully briefed and is ripe for decision.

### III.  LEGAL STANDARD

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  In response, the non-movant must point to specific facts in the record that reveal a genuine issue suitable for trial.  *See Celotex*, 477 U.S. at 324.

### IV.  ANALYSIS

#### A.  Procedural Due Process (Count I)

In Count I, Campbell seeks compensation under § 1983 on the basis that the circumstances of her termination unconstitutionally deprived her without due process of her protected liberty interest in pursuing her chosen field of employment.  *See* Compl. ¶¶ 76–83.

"[T]o make out a violation of [procedural] due process, the plaintiff must show the Government deprived her of a 'liberty or property interest' . . . and that 'the procedures attendant upon that deprivation were constitutionally insufficient.'" *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014) (citation and internal alteration omitted).  The Due Process Clause of the Fifth Amendment protects a District of Columbia employee's liberty interest in "choos[ing] one's field of private employment." *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999) (articulating same liberty interest under Fourteenth Amendment); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573–74 (1972) (same).[4]  When the District takes an adverse employment action against an employee, it can deprive her of this liberty interest under two distinct (though not mutually exclusive) theories—"reputation-plus" and "stigma or disability."  *See O'Donnell v. Barry*, 148 F.3d 1126, 1139–41 (D.C. Cir. 1998); *accord Campbell*, 972 F. Supp. 2d at 45.  In addition to establishing a liberty interest deprivation, a plaintiff must further show that such deprivation occurred without sufficient process—that is, without "an opportunity to refute the charge" and "clear [her] name." *Codd v. Velger*, 429 U.S. 624, 627 (1977); *see also Roberts*, 741 F.3d at 161.

In its motion for summary judgment, the District contends that the record evidence cannot establish the deprivation of a liberty interest under either a "reputation-plus" or "stigma or disability" theory.  Below, however, the Court concludes that under both theories, Campbell has created a genuine dispute of material fact.  Because a reasonable jury could find that Campbell suffered a liberty interest deprivation and because the District no longer contends (for reasons

---

[4] Because the District of Columbia is the defendant in this case, procedural due process analysis proceeds under the Due Process Clause of the Fifth, rather than the Fourteenth, Amendment.  *See Campbell*, 972 F. Supp. 2d at 44–45, n.2 (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)).

explained below) that she received sufficient process, the Court denies the District's motion for summary judgment as to Count I.

### 1. Liberty Interest Deprivation under the "Reputation-Plus" Theory

Under the "reputation-plus" theory, an individual loses her liberty interest in pursuing her chosen profession when "defamation [is] accompanied by a discharge from government employment or at least a demotion in rank and pay."  *O'Donnell*, 148 F.3d at 1140 (emphasis omitted) (quoting *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983)).  Under D.C. law, a plaintiff asserting a defamation claim must establish:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Rosen v. Am. Israel Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012).[5]

At the outset, the District does not dispute that Campbell was terminated, or that certain statements about Campbell "accompanied" the termination.  *O'Donnell*, 148 F.3d at 1140.[6]  The parties also do not seem to dispute that there are two "statements" at issue—Ribiero's initial release to Suderman of Turnage's emails regarding his investigation into the allegations about Campbell, and Turnage's subsequent forwarding of the same emails to Suderman, as part of his

---

[5] The parties do not dispute that D.C. law governs the determination of whether any statements were defamatory.  *See* Mem. Supp. Def.'s Mot. Summ. J. 10 (citing *Rosen*); Pl.'s Mem. Opp'n 19 (same).

[6] The requirement that defamation be "accompanied by" firing or demotion arises from the recognition that "official criticism will carry much more weight if the person criticized is at the same time demoted or fired" and "helps to . . . limi[t] the constitutionalization of tort law." *O'Donnell*, 148 F.3d at 1140.

attempt to clarify and correct certain statements.  Of course, the underlying content of these statements is largely identical.[7]

In its motion for summary judgment, the District addresses the first, second, and fourth elements of the *Rosen* defamation rubric.  In the District's view, the undisputed record evidence establishes (a) the lack of any false or defamatory statement, (b) the applicability of the common interest privilege, and (c) the absence of special harm.  For the reasons given below, the Court disagrees as to each element.

### a.  False and Defamatory Statements

The District first contends that there is no evidence that any statement made by any District official was "false or defamatory."  *See* Mem. Supp. Def.'s Mot. Summ. J. 10–11.  Because a reasonable jury could conclude that certain statements were both false and defamatory, the Court denies the District's motion as to this issue.

A defamatory statement must be "false as well as defamatory."  *Rosen*, 41 A.3d at 1256 (internal quotation marks omitted).  Because falsity is required for liability, although "a statement of fact may be the basis for a defamation claim, a statement of pure opinion cannot." *Id.* (citation omitted).  "[A] statement of opinion is actionable if—but only if—it has an explicit or implicit factual foundation and is therefore objectively verifiable."  *Id.* (citation and internal quotation marks omitted).  A non-actionable opinion, by contrast, generally consists of "a subjective view, an interpretation, a theory, conjecture, or surmise."  *Id.* (citation omitted).  "[A] publication is considered defamatory 'if it tends to injure [the] plaintiff in his trade, profession or

---

[7] The record does not appear to contain the emails originally released by Ribiero, but the parties do not dispute that those emails are identical to the ones later forwarded to Suderman by Turnage.  *See* Turnage Dep. at 44:12–45:22, Pl.'s Ex. 10.  The disclosures by Ribiero and Turnage potentially differ only with respect to Turnage's clarifying comments to Suderman, but these comments bear on the issue of "malice," which the Court does not reach.  *See infra* notes 10, 13.

community standing, or lower him in the estimation of the community.'" *Olinger v. Am. Sav. & Loan Ass'n*, 409 F.2d 142, 144 (D.C. Cir. 1969) (citation omitted); *accord Rosen*, 41 A.3d at 1256. "The trial court's threshold task in an action for defamation is to determine whether the challenged statement is 'capable of bearing a particular meaning,' and 'whether that meaning is defamatory.'" *Guilford Transp. Indus. Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000) (citation omitted).

The Court concludes that there is a dispute of fact as to whether Turnage's emails were both false and defamatory. Beyond passing conclusory assertions, the District does not meaningfully dispute that a reasonable jury could find that Turnage's emails "ten[d] to injure [Campbell] in [her] trade, profession or community standing" because they concern her allegedly unethical interference with government contract management and bidding. *Olinger*, 409 F.2d at 144; Mem. Supp. Def.'s Mot. Summ. J. 11. Campbell has also created a genuine dispute of fact as to falsity by pointing to the factual assertions contained in Turnage's emails. In one email, Turnage recounts his own investigation purporting to *confirm* the allegations against Campbell: "This concludes my investigation of this issue and I will inform Director Stokes that I am firing Jennifer Campbell." Turnage email of June 4, 2012, Pl.'s Ex. 17. In another email, Turnage discredits certain claims made by Wiggins (with whom Campbell allegedly suggested CGI should partner) and suggests that Campbell had a personal relationship with Simon (whom Campbell allegedly required Compass to hire). *See* Turnage email of June 6, 2012, Pl.'s Ex. 17. The conflicting record evidence, however, could support a finding that all of the allegations

confirmed by Turnage were in fact false.  *See supra* Part II.B.  Turnage's findings are thus "statement[s] of fact" whose truth must be decided by a jury.  *Rosen*, 41 A.3d at 1256.[8]

The District attempts to reduce the emails at issue to wholly innocuous, truthful statements that the District was simply undertaking an investigation into unconfirmed "allegations."  Mem. Supp. Def.'s Mot. Summ. J. 10–11.  Of course, no one disputes that certain allegations against Campbell gave rise to an investigation.  But the Court cannot overlook the content of Turnage's emails—their detailed explication of the *substance* of the allegations and Turnage's conclusions as to their truth—given that Campbell has cited those very emails in opposing summary judgment.  *See* Pl.'s Mem. Opp'n 20–21; *Celotex*, 477 U.S. at 324 (explaining that non-movant must point to record evidence that reveals a genuine issue for trial).

### b.  Common Interest Privilege

The District next contends that the releases of Turnage's emails could not be defamatory because they were protected by the common interest privilege.  *See* Mem. Supp. Def.'s Mot. Summ. J. 11–14.  Because the District has failed to show that the privilege applies as a matter of law on the facts of this case, the Court declines to grant summary judgment on this basis.

"A statement is protected by the common interest privilege if it is '(1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has or honestly believes he has a duty (3) to a person who has such a corresponding interest or duty.'"  *Payne v. Clark*, 25 A.3d 918, 925 (D.C. 2011) (citation omitted).  "Two circumstances foreclose asserting the privilege: first, excessive publication, defined as 'publication to those with no common interest in the information communicated, or publication not reasonably

---

[8] In the alternative, even if Turnage's emails were construed as statements of "opinion," his opinion rested on "an explicit or implicit factual foundation and is therefore objectively verifiable" by a fact-finder.  *Rosen*, 41 A.3d at 1256.

calculated to protect or further the interest,' and, second, publication with malice, which, within the context of the common interest privilege, is 'the equivalent of bad faith.'" *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006) (citations omitted) (quoting *Moss v. Stockard*, 580 A.2d 1011, 1024–25 (D.C. 1990)). "While the defendant bears the burden of proving the elements of the common interest privilege, the burden of defeating the privilege by showing excessive publication or publication with malice lies with the plaintiff." *Id.*

The District has failed to carry its burden to demonstrate that the common interest privilege covers its statements. The District contends that the applicable common interest is the District's and public's shared "genuine interest" in making known "how seriously the District took allegations of impropriety regarding its employees." Mem. Supp. Def.'s Mot. Summ. J. 13.[9] To be sure, the D.C. Court of Appeals has recognized that the qualified common interest privilege governs "anything said or written by a master in giving the character of a servant who has been in his or her employment." *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 879 (D.C. 1998) (internal alteration and quotation marks omitted); *accord Payne*, 25 A.3d at 926 (citing *Wallace* for the proposition that the common interest privilege applies to "a statement made by an employer regarding the conduct of an employee"). But the District cites no legal authority (let alone any potentially applicable line of D.C. Court of Appeals decisions) showing that the common interest privilege applies to the facts of this case, and this Court "may

---

[9] The District describes this interest in various (and somewhat inconsistent) ways. The District asserts that it acted out of "a genuine interest to [sic] the District and the public to clarify what steps the District was taking in response to the allegations and out of a genuine interest to [sic] Plaintiff in respecting Plaintiff's potential innocence," Mem. Supp. Def.'s Mot. Summ. J. 14, that it had "an interest in informing the public," and that the public "had an interest in learning that the District takes allegations of misconduct seriously," Def.'s Reply 5. Even assuming that the District has articulated more than one interest, the Court would still conclude that the District has failed to establish that any asserted interest is a "common interest" under D.C. law.

not do the defendant's summary-judgment work for it." *Coleman v. District of Columbia*, 794 F.3d 49, 61 (D.C. Cir. 2015) (concluding that district court erred by crafting non-retaliatory reasons for employment action under DCWPA, which reasons defendant did not assert).[10]

Even if the Court were to excuse the District's deficient briefing and consider the employment-based common interest privilege recognized by the D.C. Court of Appeals, the common interest at stake when an employer "giv[es] the character," *Wallace*, 715 A.2d at 879, or describes "the conduct" of an employee, *Payne*, 25 A.3d at 926, is conceptually distinct from the District's asserted interest in showing the public "*how seriously* [it] *took allegations* of impropriety regarding its employees," Mem. Supp. Def.'s Mot. Summ. J. 13 (emphasis added). In contrast to an employer's interest in opining on *an employee's* character, the District's asserted interest here is one of managing public perceptions of *the employer's* own character. Moreover, the D.C. Circuit, in a decision cited approvingly by the D.C. Court of Appeals, has recognized the employment-based common interest privilege when the statement is "made in good faith *in answer to an inquiry by one contemplating employment of the servant*"—a condition clearly not evinced by the record in this case. *Wash. Times Co. v. Bonner*, 86 F.2d 836, 840 (D.C. Cir. 1936) (emphasis added); *accord Wallace*, 715 A.2d at 879.[11]   In any event,

---

[10] The District includes a passing citation to *Payne v. Clark*'s general three-part framework (quoted above), but does not invoke any case that explains the type of "interest" that can support a finding of privilege on the facts in this case. *See* Mem. Supp. Def.'s Mot. Summ. J. 11–14. The District focuses more on the law governing malice, apparently conflating its burden with Campbell's. *See id.* at 12 (quoting *Payne*'s discussion of defendant's "primary motive," which inquiry a court undertakes only after a defendant has established an "interest which is entitled to protection," *Payne*, 25 A.3d at 925–26); *id.* at 13–14 (arguing that Turnage did not act with malice).

[11] *But see Mastro*, 447 F.3d at 858 (finding that privilege covered company's statements about an employee's termination to other employees and to a government agency, which all had "a legitimate interest in knowing about the nature and outcome of personnel actions" at the company).

in the absence of sufficient briefing, the Court need not determine whether the District's asserted interest is recognized under D.C. law.[12]

Accordingly, the District has not carried its burden to show that the common interest privilege forecloses Campbell's claim under the "reputation-plus" theory. *See Celotex*, 477 U.S. at 323.[13]

### c. Special Harm

Lastly, the District contends that the record evidence cannot establish that Campbell suffered "special harm," which is "limited to actual pecuniary loss." *See* Mem. Supp. Def.'s Mot. Summ. J. 14–15. But Campbell's declaration states that she earned only about $20,689 in total from her work during the two years following her termination, *see* Campbell Decl. ¶ 53, Pl.'s Ex. 1, as compared with her previous and subsequent full-time salaries of $146,000 and $136,000, respectively, *see id.* ¶¶ 2, 56. Accordingly, Campbell has proffered evidence of lost earnings sufficient to create a genuine dispute of fact on the "special harm" element of the defamation test.[14]

---

[12] Other authorities describe the common interest privilege in ways that appear less applicable to the case at hand. *See Payne*, 25 A.3d at 926 (reviewing cases finding privilege applicable to reports about suspected wrongdoing made to law enforcement and communication between church members); Restatement (Second) of Torts § 594 cmt. d (1977) (explaining that the publisher's "sufficiently important interest" ordinarily is sufficiently important to warrant "direct" legal protection, such as one protected by civil or criminal law, or "indirect" legal protection, such as the "interest of a parent in the social and moral welfare of his child").

[13] Because the District has not discharged its "burden of proving the elements of the common interest privilege," the Court does not reach the question whether Campbell has "defeat[ed] the privilege by showing excessive publication or publication with malice." *Mastro*, 447 F.3d at 858.

[14] In reply, the District argues that Campbell has conceded the special harm issue by failing to respond in her opposition. *See* Def.'s Reply 5. Although Campbell fails to respond directly in the section of her opposition addressing the "reputation-plus" theory, she does discuss evidence of her financial losses in the context of the "stigma or disability" theory. *See* Pl.'s Mem. Opp'n 35. While the organization of Campbell's briefing leaves much to be desired, the Court declines to deem the issue of special harm conceded.

\*      \*      \*

As to each element of defamation that the District's motion has put into issue, the Court rejects the District's arguments: The record evidence could support jury findings that the District's disclosures of Turnage's emails satisfy the "false and defamatory" and "special harm" prongs of the defamation test, and the District fails to establish that the common interest privilege covers its disclosures.  Because the District's contention that Campbell cannot establish defamation is the only basis for its motion for summary judgment as to the "reputation-plus" theory, the Court denies the District's motion as to this theory of Campbell's liberty interest deprivation.

### 2.  Liberty Interest Deprivation under the "Stigma or Disability" Theory

In contrast to the "reputation-plus" theory, the "stigma or disability" theory hinges not on "official *speech*, but on a continuing stigma or disability arising from official *action*." *O'Donnell*, 148 F.3d at 1140 (emphasis added).  Such "stigma or disability" results when state action has the "broad effect of largely precluding [the employee] from pursuing her chosen career."  *Id.* at 1141 (citation omitted).  The official action must have "the effect of seriously affecting, if not destroying a plaintiff's ability to pursue his chosen profession, or substantially reducing the value of his human capital."  *Id.* (internal quotation marks, alterations, and citations omitted); *see also Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1506–07 (D.C. Cir. 1995) (explaining that the standard is "high").[15]

---

The District also contends that Campbell cannot prevail on a "defamation per se" theory, under which no proof of harm would be necessary.  *See* Mem. Supp. Def.'s Mot. Summ. J. 14–15 (citing *Franklin v. Pepco Holdings, Inc.*, 875 F. Supp. 2d 66, 75 (D.D.C. 2012)).  But Campbell does not argue that the statements at issue were defamatory *per se*.

[15] A "stigma or disability" claim can also be premised on a formal, automatic exclusion from a class of employment opportunities.  *See O'Donnell*, 148 F.3d at 1140–41.  The Court

The Court concludes that Campbell has proffered evidence that could support an inference that her termination from DHCF had the "broad effect of largely precluding [her] from pursuing her chosen career." *O'Donnell*, 148 F.3d at 1141 (citation omitted).  During the two years after her termination, despite applying for over thirty positions, Campbell secured only two consulting contracts and an adjunct teaching position, and a reasonable jury could find that none of this work fell within her chosen field of healthcare finance or management.  *See* Campbell Decl. ¶¶ 53–55, Pl.'s Ex. 1; Health Dimensions Group contract, Pl.'s Ex. 30, ECF No. 25-6; Wright Group contract, Pl.'s Ex. 31, ECF No. 25-6.[16]  In addition, a vocational rehabilitation counselor found that Campbell's inability to secure employment resulted from the "taint of suspicion" created by online reports of her termination and lawsuit.  *See* Vocational Assessment, Pl.'s Ex. 32.[17]

---

noted in its prior opinion that this type of "stigma or disability" is not at issue here, and the summary judgment briefing does not suggest otherwise.  *See Campbell*, 972 F. Supp. 2d at 45.

[16] One consulting engagement involved advising a healthcare business's management on a potential market entry, and the District makes no attempt to equate advisory services with management.  *See* Health Dimensions Group contract, Pl.'s Ex. 30 (describing "scope of work" in Ex. A to contract); Mem. Supp. Def.'s Mot. Summ. J. 16.  A fact-finder could conclude that Campbell's other consulting contract for which she conducted public health trainings on HIV and domestic violence, *see* Wright Group contract, Pl.'s Ex. 31, and teaching position are even further removed from healthcare finance or management.

[17] The District incorrectly asserts that, as a matter of law, a plaintiff must show the loss of a "specific job opportunity" in order to demonstrate stigma or disability.  Mem. Supp. Def.'s Mot. Summ. J. 16; *see also O'Donnell*, 148 F.3d at 1141 (stating that test is whether state action creates "broad effect of largely precluding [the employee] from pursuing her chosen career" (citation omitted)).  Even if there were such a stringent requirement, Campbell has satisfied it here with evidence of her failed application to Planned Parenthood: Campbell has proffered Molly Eagan's emails showing that Eagan was the first within Planned Parenthood to surface "an issue" with Campbell "politically" and that subsequent internal discussions about the *Washington Post* article gave many decision-makers pause about Campbell's candidacy.  Planned Parenthood emails, Pl.'s Ex. 29.  Although the District relies on Eagan's deposition testimony denying that the decision not to hire Campbell had anything to do with her termination from DHCF, this contradiction is a dispute of fact that cannot be resolved at summary judgment.  *See* Def.'s Reply 6 (citing Eagan Dep. at 7:22–8:9, Def.'s Reply Ex. C, ECF No. 27-1).

In reply, the District contends that a finding of "stigma or disability" is foreclosed by the

fact that in July 2014, two years after her termination, Campbell secured her current job, which,

she concedes, is within her chosen field.  *See* Campbell Decl. ¶ 58, Pl.'s Ex. 1; *see also* Def.'s

Reply 5–6.  The District's implicit argument is that as a matter of law, an actionable liberty

deprivation must last longer than two years, but it (again) cites no authority for its contention.

The District's failure to explain the legal basis for its duration argument is alone grounds for

rejecting it.  *See Celotex*, 477 U.S. at 323 (describing movant's "initial responsibility" of

showing "absence of a genuine issue of material fact").  Moreover, the Court knows of no

authority supporting a bright-line minimum duration rule and declines to craft one here in the

absence of sufficient briefing.  *Compare Wisconsin v. Constantineau*, 400 U.S. 433, 435, 437

(1971) (holding that police notice in local retail liquor stores barring sales or gifts of liquor to

Constantineau "for one year" imposed a "badge of infamy" and required procedural protections);

*Taylor*, 56 F.3d at 1507 (recognizing in dicta that "temporary" inability to pursue chosen

profession could support procedural due process claim, though not a finding of irreparable injury

for purposes of obtaining a preliminary injunction), *Blantz v. Cal. Dep't of Corr. & Rehab., Div.

of Corr. Health Care Servs.*, 727 F.3d 917, 925 (9th Cir. 2013) ("Stigmatizing statements that

merely cause reduced economic returns and diminished prestige, but not permanent exclusion

from, *or protracted interruption of*, gainful employment within the trade or profession do not

constitute a deprivation of liberty." (emphasis added) (citations and internal quotation marks

omitted)).[18]

---

[18] Additionally, because the District raises this argument only in reply, the Court would
be within its discretion to deem it waived.  *See Walker v. Pharm. Research & Mfrs. of Am.*, 461
F. Supp. 2d 52, 58 n.9 (D.D.C. 2006).

Because Campbell has proffered evidence that as a result of the circumstances of her termination from DHCF, she was unable to secure employment in her chosen field for a two-year period, she has created a genuine dispute of material fact as to the deprivation of her liberty interest under the "stigma or disability" theory.

### 3.  Sufficiency of Process

Even if Campbell has created a dispute of material fact as to the deprivation of her liberty interest under both the "reputation-plus" and "stigma or disability" theories, her procedural due process claim would still fail if she had received a constitutionally sufficient post-termination opportunity to seek a "name-clearing" hearing.  *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1113 (D.C. Cir. 1985); *see also Codd*, 429 U.S. at 627.  In its motion for summary judgment, the District initially argued that Campbell received constitutionally adequate process.  *See* Mem. Supp. Def.'s Mot. Summ. J. 17; Def.'s Reply 7.  But in response to the Court's order for supplemental briefing, the District subsequently withdrew this argument.  *See* Def.'s Response, ECF No. 32.  Because the District no longer contends that Campbell received constitutionally adequate process, the Court need not address the issue further.

In the interest of clarifying the law, however, the Court explains the reasons behind the District's about-face.  In support of its initial argument that Campbell received sufficient process, the District relied exclusively on *McCormick v. District of Columbia*, 752 F.3d 980 (D.C. Cir. 2014).  *See* Mem. Supp. Def.'s Mot. Summ. J. 17.  In that case, McCormick was a Supervisory Correctional Officer in the D.C. Department of Corrections, an at-will position in the Management Supervisory Service.  *See McCormick*, 752 F.3d at 982.  After an internal investigation concluded that he had assaulted an inmate, he was terminated for cause.  *See id.* at 983.  In the district court, he claimed that his for-cause termination deprived him without due

process of his liberty interest in obtaining future employment in his chosen field.  *See id.* at 984,

987–88.  On appeal, the D.C. Circuit held that because McCormick had the right to bring in

Superior Court "an action for review, including one for severance" (which is not payable to

employees terminated for cause), he was given the right to the "name-clearing hearing" required

by the Due Process Clause.  *Id.* at 990.[19]  Rejecting McCormick's argument that his status as an

at-will Management Supervisory Service employee precluded him from seeking severance or

otherwise challenging his termination, the court pointed to the fact that the D.C. Code "provides

a severance schedule for members of the Management Supervisory Service."  *Id.* (citing D.C.

Code § 1–609.54).  Accordingly, the court affirmed the grant of summary judgment, concluding

that "even assuming that McCormick has provided sufficient evidence of a deprivation of his

liberty interest, such deprivation was not without due process."  *Id.*

 Here, the District initially contended in its motion for summary judgment that Campbell,

like McCormick, had an opportunity to clear her name by seeking severance pay in Superior

Court.  To be sure, unlike McCormick, Campbell was a member of the Excepted Service, not the

Management Supervisory Service.  *See* Termination letter of June 11, 2012, Pl.'s Ex. 2; Def.'s

Statement of Facts ¶ 3, ECF No. 24-1; *see also* D.C. Code § 1–609.01 (explaining mutual

exclusivity of Excepted Service and Management Supervisory Service).  But the District

---

[19] In granting summary judgment to the District, the district court had reasoned that
McCormick had ample opportunity to "clear his name" because the District of Columbia's
Comprehensive Merit Personnel Act ("CMPA"), D.C. Code §§ 1–601.01 *et seq.*, enables any
District employee to challenge in administrative proceedings before the Office of Employee
Appeals ("OEA") an "adverse action for cause that results in removal."  *See McCormick v.
District of Columbia*, 899 F. Supp. 2d 59, 67–69 (D.D.C. 2012) (quoting D.C. Code § 1–
606.03(a)).  On appeal, the District conceded that it had been mistaken (in successfully
persuading the district court) as to the "forum" for this post-termination process—this forum was
not the OEA, but the D.C. Superior Court.  *See* Br. for Appellees, *McCormick v. District of
Columbia*, 2013 WL 2456550, at *39 (June 7, 2013).  The D.C. Circuit acknowledged the
District's mistake but otherwise agreed with the district court's conclusion that McCormick had
been afforded sufficient process.

explained that the District of Columbia's Comprehensive Merit Personnel Act ("CMPA"), D.C.

Code §§ 1–601.01 *et seq.*, provides that Excepted Service employees, like Management

Supervisory Service employees, can receive severance pay "upon separation for non-disciplinary

reasons" according to a statutory severance schedule.  D.C. Code §§ 1–609.03(f), 1–609.54(b).

Because the *McCormick* court found dispositive the presence of a severance schedule in holding

that a Management Supervisory Service employee could clear his name in an action for

severance pay, the District initially argued that this Court, too, must conclude that Campbell

enjoyed the same process.  *See McCormick*, 752 F.3d at 990.

In response to the Court's order for supplemental briefing, however, the District now

concedes that its reliance on *McCormick* was misplaced.  *See generally* Def.'s Response.[20]  The

District first explains that the version of the CMPA governing the dispute in *McCormick*

provided that Management Supervisory Service employees "*shall be* given severance pay . . .

upon separation for non-disciplinary reasons," D.C. Code § 1–609.54(b) (2011) (emphasis

added), and that a parallel provision with the same mandatory language applied to Excepted

Service employees, *see* D.C. Code § 1–609.03(f) (2011).  But on March 14, 2012, certain

amendments to the CMPA rendered severance pay discretionary; now, Management Supervisory

Service and Excepted Service employees "*may be* paid severance pay upon separation for non-

disciplinary reasons."  *See* District of Columbia Government Comprehensive Merit Personnel

Amendment Act of 2012, 2012 D.C. Laws 19–115 (Act 19–290), § 2(d)(3), (f) (emphasis added),

*as codified at* D.C. Code §§ 1–609.03(f), 1–609.54(b) (2013).  This discretionary language, the

District explains, renders *McCormick* inapplicable because Excepted Services employees

---

[20] The Court's order for supplemental briefing identified several questions concerning the District's initial reliance on *McCormick*.  *See* Order Directing the Parties to Submit Suppl. Briefing 6–7, ECF No. 30.

"cannot necessarily premise a name clearing hearing on an *entitlement* to severance pay."  Def.'s Response 3 (emphasis added).  Accordingly, in the District's judgment, because Campbell was an Excepted Service employee terminated in June 2012 after the CMPA amendments took effect, *McCormick* does not control this case.[21]

Because the District has withdrawn its initial argument that Campbell received constitutionally sufficient process under *McCormick*, and because it has proffered no alternative argument, the District has failed to show the absence of a genuine dispute of material fact on the sufficiency-of-process issue.

\*     \*     \*

Because Campbell has created a genuine dispute of material fact as to the deprivation of her liberty interest in pursuing her chosen profession under both the "reputation-plus" and "stigma or disability" theories, and because the District no longer contends that this deprivation occurred with constitutionally adequate process, the Court denies the District's motion for summary judgment as to the procedural due process claim.[22]

---

[21] The District does not assert that there were "other rights Campbell had that might have been enforceable through a civil action in Superior Court" or that any other type of civil action would have served as a sufficient name-clearing hearing.  Def.'s Response 5; *see also id.* at 4.  The Court, of course, need not pass on the correctness of this—or any—reasoning in the District's supplemental briefing, given that the District has withdrawn its sufficiency-of-process argument altogether.

[22] Campbell's supplemental filing contends that the Court must deny the District's motion solely because the District has withdrawn its argument that she received adequate process.  *See* Pl.'s Suppl. Br. 1, 6, ECF No. 33.  This is incorrect.  The Court could still grant summary judgment on the procedural due process claim if there were no genuine dispute of fact as to the deprivation of a liberty interest under both the "reputation-plus" and "stigma or disability" theories.  Here, however, Campbell has created such a dispute under both theories (though a dispute under one theory would have enabled her claim to survive summary judgment).  *See supra* Part IV.A.1, A.2.

## B.  D.C. Whistleblower Protection Act (Count III)

Count III of the complaint alleges that on account of Campbell's disclosures regarding the CGI contract irregularities, the District retaliated against her in violation of the DCWPA by releasing the emails to Suderman and, ultimately, by terminating her.  *See* Compl. ¶¶ 90–94.

The DCWPA aims to "encourage disclosure of wrongdoing to persons who may be in a position to act to remedy it."  *Wilburn v. District of Columbia*, 957 A.2d 921, 925 (D.C. 2008). To that end, the Act provides that "[a] supervisor shall not take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order."  D.C. Code § 1– 615.53(a).  The Act defines "protected disclosure" to include disclosures of information that the employee reasonably believes demonstrates "[g]ross mismanagement" or "[a]buse of authority in connection with the administration of a public program or the execution of a public contract." *Id.* § 1–615.52(a)(6).

The DCWPA also establishes a "distinct" burden-shifting framework applicable to civil actions for violations of the Act.  *Coleman*, 794 F.3d at 54.  A plaintiff must first make out a *prima facie* claim of prohibited retaliation by showing by a preponderance of the evidence that "(i) she made a statutorily protected disclosure, and (ii) the disclosure was a 'contributing factor' behind (iii) an adverse personnel action taken by her employer."  *Id.* (citing *Crawford v. District of Columbia*, 891 A.2d 216, 219, 221 (D.C. 2006)).  Upon such a showing, "the burden of proof shall be on the defendant to prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected" by the Act.  D.C. Code § 1–615.54(b).  Under this framework, then, the "burden of persuasion *remains* on the defendant even once a legitimate and independent

rationale for an action has been articulated." *Coleman*, 794 F.3d at 62 (contrasting DCWPA burden of persuasion under section 1–615.54(b) with federal Title VII burden of production under *McDonnell-Douglas*).  Accordingly, at summary judgment, courts must "view the evidence presented through the prism of [this] clear and convincing substantive evidentiary burden." *Id.* at 58 (citation and internal quotation marks omitted).

Here, the District does not contend that Campbell has failed to make out a *prima facie* claim of retaliation under the DCWPA; it argues only that Campbell would have been terminated for legitimate, independent reasons even had she not engaged in protected activity. *See* Mem. Supp. Def.'s Mot. Summ. J. 17–18. Accordingly, the Court will proceed under the assumption that Campbell has established a *prima facie* case.[23] The analysis below, then, focuses on the District's proffered independent reasons for her termination.

The Court finds that the District has not met its burden "to prove by clear and convincing evidence" that Campbell would have been terminated for "legitimate, independent reasons" even if she had not engaged in activity protected by the DCWPA. D.C. Code § 1–615.54(b); *accord Coleman*, 794 F.3d at 54. First, Campbell's evidence undermines the "legitima[cy]" of the District's proffered reasons. The District claims that it acted on the basis of the three allegations of contract steering, and that Campbell would have been terminated for this reason even if she had not engaged in any whistleblowing. *See* Mem. Supp. Def.'s Mot. Summ. J. 18. But in opposing summary judgment, Campbell has "c[ome] forward with affirmative evidence that

---

[23] In reply, the District contends that Campbell cannot amend her complaint through her opposition, which contends that her objections to Turnage's "open door policy" were also protected by the DCWPA. *See* Def.'s Reply 7–8; Pl.'s Mem. Opp'n 37–38; *see also District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263 (D.D.C. 2010) ("[A] party may not amend its complaint or broaden its claims through summary judgment briefing."). Although Count III "incorporates by reference" earlier sections of the complaint, Compl. ¶ 90; *see also id.* ¶¶ 18–22, the Court agrees with the District that Count III expressly alleges only that Campbell's protests about the CGI contract were "protected disclosures" under the DCWPA, *see id.* ¶¶ 25, 92.

counter[s] [the District's] proffered rationale" for her termination—evidence that controverts each of the allegations against her. *Coleman*, 794 F.3d at 63; *see supra* Part II.B (reviewing conflicting record evidence); *cf. Bowyer v. District of Columbia*, 793 F.3d 49, 55 (D.C. Cir. 2015) (concluding that defendant met burden of proof under DCWPA where it offered an "unrebutted explanation" for alleged retaliation); *accord Coleman*, 794 F.3d at 66 n.10. Second, as Campbell explains, the evidence showing that Turnage's investigation occurred in the space of only a few days and soon after Campbell refused to approve the CGI contract could support an inference that the District's reasons were not wholly "legitimate" and "independent." *See* Turnage email of June 4, 2012, Pl.'s Ex. 17; Pl.'s Mem. Opp'n 39; *see also Coleman*, 794 F.3d at 63 (reasoning that defendant could not "cherry pic[k] a few words and phrases out of [plaintiff's] memoranda and labe[l] them 'paranoid' and 'disturbing'" in order to justify a psychological examination).

The Court notes that the District does not contend that the DCWPA permits a defendant to assert that its "stated belief about the underlying facts is *reasonable* in light of the evidence" even if such belief turns out ultimately to be incorrect—a viable approach under federal employment discrimination statutes. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008) (emphasis added) (citing *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005)). In *Coleman v. District of Columbia*, the panel majority explained that although the defendant "perhaps could have" relied on such a theory in moving for summary judgment on a DCWPA claim, "it did not do so." *Coleman*, 794 F.3d at 65. Parting ways with the dissent, the majority declined to consider this theory, explaining that it is not "appropriate . . . to save a summary-judgment movant from the consequences of its own muddled litigation strategy." *Id.* (citation and internal quotation marks omitted); *see also id.* at 61 (explaining that the district

court erred by "impl[ying] justifications the [defendant] had not advanced").  Likewise, here, because the District does not argue that Turnage had a "reasonable" belief—even if incorrect—in the truth of the allegations against Campbell, the Court need not decide whether the DCWPA recognizes such a theory and, if so, whether the District has proven by clear and convincing evidence that Turnage's belief was in fact reasonable.[24]

Because the District has not met the DCWPA's demanding burden of proving by "clear and convincing evidence" that Campbell would have been terminated for "legitimate, independent reasons" even if she had engaged in activity protected by the Act, the Court denies the motion for summary judgment as to Count III.

### C.  Wrongful Termination (Count IV)

In Count IV, the complaint alleges that Campbell was wrongfully terminated against public policy, in violation of D.C. common law.  *See* Compl. ¶¶ 95–99.

The D.C. Court of Appeals has recognized a common-law tort of wrongful discharge "as an exception to the traditional at-will doctrine governing termination of employment, where the discharge violates a clear mandate of public policy."  *Carter v. District of Columbia*, 980 A.2d 1217, 1225 (D.C. 2009) (citations and internal quotation marks omitted).  But if the D.C. Council has "creat[ed] a specific, statutory cause of action to enforce" the public policy at issue, courts must "decline to recognize a novel, competing cause of action for wrongful discharge at common

---

[24] In reply, the District submits that "Plaintiff's unsubstantiated conspiracy theories and attempts to dispute the truth of the allegations themselves do not raise a material dispute that the District had a legitimate reason to terminate her based on the allegations and Director Turnage's investigation alone."  Def.'s Reply 9.  While this sentence could be construed to suggest that the District's belief in the allegations was "reasonable" even if incorrect, the District does not squarely advance such an argument.  In supporting a motion for summary judgment, "it is not and should not be enough merely to mention a possible argument in the most skeletal way in one sentence" and "leave the court . . . to do counsel's work."  *Coleman*, 794 F.3d at 65 (citation and internal quotation marks omitted).

law." *Id.* at 1226 (affirming grant of summary judgment on wrongful discharge claim premised

on alleged whistleblowing protected by DCWPA); *accord Lockhart v. Coastal Int'l Sec., Inc.*, 5

F. Supp. 3d 101, 107 (D.D.C. 2013) (granting defendant summary judgment and explaining that

plaintiffs "may not rely upon an alleged [D.C. Family Medical Leave Act] violation as the basis

for their wrongful discharge claim because this statute itself provides a statutory remedy").

On this record, Campbell may not seek relief under a wrongful discharge theory because

the D.C. Council, by enacting the DCWPA, has created a cause of action to further the same

public policy that she seeks to vindicate—the protection of whistleblowing.  Here, Campbell

alleges that she was terminated because of her disclosure of certain irregularities in the CGI

contract and persistent refusal to approve the contract, notwithstanding directives to do so.  *See*

Compl. ¶¶ 96–97.  Indeed, Campbell brings a separate claim under the DCWPA, premised

essentially on the same facts.  *See supra* Part IV.B.[25]

Because Campbell may not bring a wrongful discharge claim to vindicate a public policy

that the D.C. Council has opted to protect using the DCWPA, the Court grants the District's

motion for summary judgment as to Count IV.

---

[25] In elaborating on her wrongful termination claim in Count IV, Campbell highlights her allegation that she "refused to modify the CBE [certified business enterprise] guidelines" for the benefit of CGI.  *See* Compl. ¶ 97; *see also id.* ¶¶ 27–32.  Read in context, Count IV's allegation that Campbell "refused to modify" CBE guidelines supports a separate allegation of whistleblowing, though the complaint is not a model of clarity.  *Compare id.* ¶ 96 (alleging that "Defendants urged Plaintiff to perform certain actions concerning CGI"), *with* ¶ 32 (alleging that Turnage "concurred" in Campbell's refusal to grant CGI a waiver).  Thus, under any reading of Count IV and the complaint as a whole, Campbell's wrongful discharge claim is foreclosed.

To be clear, even if Campbell had not asserted a DCWPA claim or if the Court had granted summary judgment on that claim, the Court's analysis here would be unaffected.  *See Carter*, 980 A.2d at 1226 n.27 (noting that Carter did not assert claim under DCWPA, which statute nonetheless foreclosed his wrongful discharge claim).

**V.  CONCLUSION**

For the foregoing reasons, the District's motion for summary judgment (ECF No. 24) is

**GRANTED IN PART** and **DENIED IN PART**.  An Order consistent with this Memorandum

Opinion is separately and contemporaneously issued.

Dated:  September 4, 2015                                       RUDOLPH CONTRERAS
                                                               United States District Judge